**GLOBAL MARINE DEVELOPMENT OF CALIFORNIA, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 74–3280.

United States Court of Appeals, Ninth Circuit.

Dec. 5, 1975.

Rehearing and Rehearing En Banc Denied Feb. 4, 1976.

Lee Smith (argued), Dallas, Tex., for petitioner.

William Bernstein (argued), of N. L. R. B., Washington, D. C., for respondent.

Richard H. Markowitz (argued), of Markowitz & Glanstein, New York City, for charging party.

## OPINION

Before WALLACE and SNEED, Circuit Judges, and CARR,[*] District Judge.

WALLACE, Circuit Judge:

Global Marine Development of California, Inc. (Global), seeks review of an order of the National Labor Relations Board (Board). The Board cross-applies for enforcement of its order. We affirm and enforce.

Global owns and operates the Hughes Glomar Explorer, a unique vessel designed for deep-sea mining. The crew arrangement is also somewhat distinctive. The ship has two complete crews of 100 to 200 men that alternate operating the ship, one crew being on board while the other is on leave. Each of the crews included an engine department consisting of a chief engineer, a first assistant engineer, a second assistant engineer and three third assistant engineers. All six of these men were licensed officers. Also included in each engine department were three oilers, who were non-licensed seamen.

Each assistant engineer worked a twelve-hour shift each day. His first six hours were spent in the engine control room on watch, monitoring engine room operations. Coast Guard regulations require that a licensed engineer be on watch at all times. During this time the oiler assigned to him made rounds of the engine room, also monitoring various devices. The engineer and oiler spent the last six hours of their shift on maintenance, making various repairs and improvements. Thus, four teams of one engineer and one oiler were needed to man the ship; because each crew had only three oilers, the less experienced third assistant engineers were, at times, assigned to oiler shifts.

On its maiden voyage in 1973, the Explorer was manned by the "A" crew from the shipyards in Chester, Pennsylvania, to Bermuda. There the "B" crew replaced the "A" crew and operated the ship around Cape Horn to Long Beach. Either during the time that the ship was in the shipyards or during the trip to Bermuda, all twelve of the licensed engineers signed authorization cards for the Marine Engineers Beneficial Association (Union). Thereafter, Global's anti-union activity included promises of added benefits and threats of termination. While the Explorer was still at sea with the "B" crew, engineers from the "A" crew were summoned to Global's offices in Los Angeles and terminated. The day the Explorer arrived in Long Beach, the "B" engineers were also terminated.

Unfair labor practice charges were filed against Global by the Union, alleging that Global interfered with, coerced and eventually terminated the twelve men because of their union activities, in violation of sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3). After a full hearing, the administrative law judge found that Global had committed the alleged unfair practices and that a bargaining unit consisting of engineers and oilers was appropriate. His recommended order required Global to cease and desist from such practices, to offer reinstatement to ten of the discharged engineers and, upon request, to bargain with the Union. The Board adopted the administrative law judge's findings and order. 214 N.L.R.B. No. 40 (Oct. 22, 1974).

Global's contentions which merit our attention are: (1) that the Board erred in finding that the engineers were not "supervisors" as that term is defined by section 2(11) of the Act, 29 U.S.C. § 152(11), and thus outside the protection of section 8; (2) that the Board erred in finding that the authorization cards were

---

[*] Honorable Charles H. Carr, Senior United States District Judge, Central District of California, sitting by designation.

valid and not procured through supervisory solicitation; and (3) that a bargaining unit consisting of oilers and engineers is inappropriate.

## I

Global's main line of defense is that the twelve licensed engineers were not "employees" and that therefore Global had no duty to bargain with them. Section 2(2) of the Act excludes "supervisors" from the definition of "employees" and thus from the protections of section 8. Section 2(11) defines "supervisor" as follows:

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, *if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.*

29 U.S.C. § 152(11) (emphasis added). The parties stipulated that the chief engineers were supervisors and the Board's order does not affect them. Applying the test outlined in section 2(11), the Board found that the assistant engineers were not supervisors. Global contends that this determination was error.

■ The Board's findings can be overturned only if they are not supported by substantial evidence from the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–91, 71 S.Ct. 456, 95 L.Ed. 456 (1951). While it has been held that the criteria set forth in section 2(11) are to be read and applied disjunctively, *Arizona Public Service Co. v. NLRB*, 453 F.2d 228, 230 (9th Cir. 1971), and that the existence of the powers, not their exercise, is determinative of one's status as a supervisor, *NLRB v. Southern Seating Co.*, 468 F.2d 1345, 1347 (4th Cir. 1972), the statute nevertheless grants the Board wide discretion

in determining whether the powers are exercised routinely or require the use of independent judgment. *NLRB v. Swift & Co.*, 292 F.2d 561, 563 (1st Cir. 1961), *quoted with approval in Marine Engineers Beneficial Association v. Interlake S. S. Co.*, 370 U.S. 173, 179 n. 6, 82 S.Ct. 1237, 8 L.Ed.2d 418 (1962).

■ We find that the Board's findings are supported by substantial evidence in the record. The engine department personnel appear to have been under the direct supervision of the chief engineer, with only a formal but structurally unnecessary "pecking order" established internally. The chief engineer was responsible for personnel and maintenance assignments, was the final arbiter of adjustments and grievances and was consulted immediately in the event of any mechanical failure that required slowing or stopping the ship, even though a licensed engineer was on watch in the control room at the time. Functions other than that of watch engineer seem to have been interchanged frequently among the assistant engineers and oilers. While the watch engineer was technically responsible for the engine room operations during his watch, there is testimony that his powers—both extant and exercised—were routine in nature. Some disciplinary powers were also possessed by the officers, but the extent of those powers is unclear in the record; it does not appear, however, that those powers were exercised, despite some rather blatant insubordination. It is our impression that the record demonstrates that the engine department on the Explorer was unique among engine departments. In other circumstances assistant engineers might be supervisors but here we find no error in the Board's findings that the assistant engineers did not possess powers sufficient to warrant their classification as supervisors.

## II

■ Global contends that the union authorization cards were invalid on the grounds that supervisory personnel par-

ticipated in obtaining them. The only supervisors involved—the two chief engineers—attended some union meetings and signed authorization cards themselves, but the record suggests that they played only minor roles in the organization process. The type of solicitation which invalidates a union selection process is one that must "contain the seeds of potential reprisal, punishment, or intimidation [or] the involvement of the supervisors does not rise to the level of supervisory 'solicitation.'" *NLRB v. WKRG–TV, Inc.,* 470 F.2d 1302, 1316 (5th Cir. 1973). The record supports the Board's conclusion that the chief engineers' activities did not constitute supervisory solicitation. Inasmuch as none of the other engineers was a supervisor, solicitation by the assistant engineers does not invalidate the authorization cards.

### III

While it is apparent that the oilers had not sought union representation, the Board's order created a bargaining unit consisting of the ten assistant engineers and the six oilers. The determination of whether there is a sufficient community of interests between engineers and oilers to justify a collective bargaining unit composed of the two groups is a matter left to the discretion of the Board. *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

The record amply supports a finding of the appropriateness of this bargaining unit. The unit consists of all non-supervisory personnel in the engine department. Assistant engineers and oilers work side by side on the maintenance shifts, performing essentially identical labor. While their assignments differ somewhat on the watch shift, they have a common area of responsibility and coordinate their activities. Other than the task of standing watch, the job functions are frequently interchanged between engineers and oilers; indeed, on the voyage from Chester to Long Beach, four of the six third assistant engineers were also assigned shifts as oilers. We

find no abuse of discretion in the Board's determination of an appropriate bargaining unit.

Affirmed and enforced.