**GEORGE C. FOSS COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 84–7334, 84–7442.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 10, 1984.

Decided Jan. 31, 1985.

---

Dennis R. Murphy, Diepenbrock, Wulff, Plant & Hannegan, Sacramento, Cal., for petitioner.

Jesse Gill, N.L.R.B., Washington, D.C., for respondent.

Before CANBY, NORRIS and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

The NLRB found that the George C. Foss Co. ("the Company") committed an unfair labor practice by prematurely discharging ten employees for failing to join a union with which the Company had a union security agreement. The Company appeals the Board's finding that one of the terminated employees was not a supervisor. It also asserts a due process claim based on an alleged discrepancy between the violation charged and the violation found by the Administrative Law Judge ("ALJ"). The NLRB filed a cross-application for enforce-

ment of its order. We affirm the Board's decision and enforce the order.

A. FACTS

The Company is an electrical construction contractor. Prior to February 1982, it had ten employees who were members of the National Association of Independent Unions ("NAIU").

Shortly after the end of work on Friday, February 12, 1982, the Company signed a collective bargaining agreement with the International Brotherhood of Electrical Workers, Local 340 ("IBEW"). The agreement contained a union security clause that required all Company employees, as a condition of employment, to become members of the IBEW "from and after the eighth day following the ... effective date of this agreement." The contractual grace period was apparently designed to take advantage of a narrow statutory exception to what would otherwise be an unfair labor practice:

> It shall not be an unfair labor practice ... for an employer engaged primarily in the building and construction industry to make an agreement ... with a labor organization ... [requiring] as a condition of employment, membership in such labor organization after the seventh day following ... the effective date of the agreement....

29 U.S.C. § 158(f).

The ten NAIU employees were informed about the new contract on Tuesday, February 16, when Company Field Superintendent Carl Beerman told them they would lose their jobs if they failed to join the IBEW by Friday, February 19. On the morning of February 19, Beerman asked the workers whether they intended to join the IBEW. All ten employees responded negatively. Beerman then had final paychecks distributed to them shortly before the end of the work day.

The NAIU filed an unfair labor practice charge. The NLRB investigated and issued a complaint alleging that the Company had discharged "the employees named

therein [because they] were members of the NAIU."

On the first day of the two day hearing, the National Electrical Contractors Association of Sacramento moved to intervene to support a multi-party collective bargaining agreement that it thought might be challenged. The ALJ ultimately denied the motion on the ground that the parties did not dispute the validity of the contract. In arguing that issue, however, the Company's attorney characterized his understanding of the charge as "not whether we required them to be members of IBEW but whether we discriminated against them because they were members of NAIU." The ALJ agreed. A few moments later, the NLRB attorney explained that "[t]he Complaint alleges merely that the employees were terminated because of their allegiance or their membership in NAIU. In reverse, that may be argued that's because they are not IBEW members."

The ALJ ultimately found that the Company had "unlawfully applied the union security provision so as to limit [to] less than 7 days, the grace period before which the employees could be required to join [IBEW] Local 340." He added in a footnote:

> [T]he complaint alleged that the employees were discharged because of their membership in NAIU. However, inconsequential or technical variances between the phraseology or characterization of the violation charged and the violation found are not a valid defense where it is clear the respondent "understood the issue and was afforded full opportunity to justify its actions." *N.L.R.B. v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 350 [58 S.Ct. 904, 913, 82 L.Ed. 1381] (1938); *Soule Glass and Glazing Co. v. N.L.R.B.*, 652 F.2d 1055, 1074 (1st Cir. 1981).

The ALJ also rejected the Company's argument that one of the discharged workers, William Merrow, was a supervisor rather than an employee.[1] The primary evidence regarding Merrow's status was his own extensive testimony. Merrow testified that he was the foreman in charge of "running the job." He was, however, in at least daily contact with his own Company superiors and the general contractor to report progress and receive instructions. His duties included assigning workers to specific floors and jobs within the five-story construction project based on his assessment of their capabilities and where they were needed. He could not transfer workers to or from other Company projects. Merrow had no authority to hire, discharge, lay off or promote any employee himself. However, he often told his superiors how many additional or fewer workers he needed and gave them his opinion or recommendation on whether individual workers should be promoted or laid off. Some such decisions were apparently made by informal consensus between Merrow and his superiors, while at other times Merrow's recommendations were ignored.

Merrow gave certain employees apparently informal oral warnings whenever they wasted time or took excessively long breaks. Although Merrow had the power to order employees to correct their own deficient work, he never did so. Merrow himself performed manual labor "whenever [the workers] needed a hand."

Finally, Merrow testified and Beerman confirmed that after the IBEW agreement was signed, Merrow was twice offered and twice declined a higher-paying management job as a "supervisor." Had he accepted, Merrow would have been able to stay with the Company even if all the other NAIU workers were terminated.

The ALJ found that Merrow was not a supervisor within the statutory definition of the term because

> the running of the job appears routine in nature and not requiring independent

---

**1.** Federal labor law protects employees but not supervisors from being discharged for their union activity or status. *See* 29 U.S.C. § 152(3); *Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 654–5, 94 S.Ct. 2023, 2024, 40 L.Ed.2d 443 (1974); *Parker-Robb Chevrolet, Inc.*, 262 N.L.R.B. 402 (1982).

judgment in view of the supervision and instructions received by Merrow from Sutton, the general contractor and the job blueprints.... While Merrow made work assignments, it appears that he was acting as a conduit of orders from Sutton and Chappick's superintendent and not that he exercised substantial independent judgment.... Merrow's recommendations to Sutton regarding personnel were in the nature of relaying information to Sutton from which the latter could make a determination rather than effective recommendation.... (Citations omitted.)

Based on the findings outlined above, the ALJ ordered all ten employees reinstated with backpay. The NLRB adopted most of the ALJ's findings and conclusions and affirmed his decision.

## B. SUPERVISOR STATUS

### 1. *Standard of Review*

■■■ The Company has the burden of proving that the Board erred in finding that Merrow was not a supervisor. *Walla Walla Union-Bulletin v. NLRB*, 631 F.2d 609, 613 (9th Cir.1980). Such a finding is conclusive if it is supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(f); *Laborers & Hod Carriers Local No. 341 v. NLRB*, 564 F.2d 834, 837 (9th Cir.1977). Furthermore, judicial deference to the Board's expertise in making the subtle and complex distinctions between supervisors and employees is particularly strong. *Walla Walla Union-Bulletin*, 631 F.2d at 613; *see Marine Engineers Beneficial Ass'n v. Interlake Steamship Co.*, 370 U.S. 173, 179 n. 6, 82 S.Ct. 1237, 1240 n. 6, 8 L.Ed.2d 418 (1962).

### 2. *Definition of Supervisor*

The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). The existence or exercise of *any one* of the enumerated powers combined with "independent judgment" is sufficient to confer supervisory status, regardless of how seldom or often the power is exercised. *Walla Walla Union-Bulletin*, 631 F.2d at 613. However, the fact that an employee gives minor orders or "supervises" the work of others in the common sense of the word does not necessarily make the employee a "supervisor" within the meaning of the statute. *NLRB v. Doctors' Hospital of Modesto*, 489 F.2d 772, 776 (9th Cir.1973).

### 3. *Application of Law to Facts*

Merrow's uncontradicted testimony established that he did not have or exercise authority to hire, transfer, suspend, recall, or discharge employees. He also testified that he never "adjusted their grievances." In addition, the record shows that Merrow was *offered* a job as a "supervisor" at a much higher salary just before he was terminated. Both the offer and the fact that he was terminated at all is at least facially inconsistent with the claim that he was a supervisor all along.

The Company relies primarily on Merrow's assignment of workers to particular floors or jobs within the project and his participation in Company decisions to promote or lay off certain employees. There is substantial evidence, however, to support the ALJ's findings that the work assignments did not involve the exercise of independent judgment and that Merrow did not make "effective recommendations" on promotions and layoffs.

■■■ In his testimony, Merrow clearly sought to portray himself as an employee with little or no independent discretion. He testified about his daily instructions from both his Company superiors and the general contractor. He described his allegedly "effective recommendations" to his superiors about layoffs and promotions as

informal "discussions" with and "suggestions" to those superiors. He also testified that there were occasions when his recommendations on hiring and transfers were not followed. The Company presented no contradictory testimony. All of the evidence is therefore consistent with a foreman's routine "supervisory" duties and with the practice of a prudent employer to seek the advice of his foreman in evaluating employees. Accordingly, we affirm the finding that Merrow was not a supervisor.

## C. DUE PROCESS CLAIM

■ The complaint charged that the employees were terminated because they were members of the NAIU. The ALJ found that they were discharged before the end of the applicable grace period because they were not members of the IBEW. The Company asserts that its due process rights were violated because it was found guilty of an unfair labor practice that was not charged in the complaint. *See, e.g., NLRB v. Complas Industries, Inc.,* 714 F.2d 729, 733–34 (7th Cir.1983). The NLRB responds that the general rule does not apply here because the differences between the allegations and the findings are merely technical or semantic and the parties fully litigated the matter. We agree with the NLRB.

We have recently stated that

[a]ctions before the Board are not subject to the technical pleading requirements that govern private lawsuits. *NLRB v. Carilli,* 648 F.2d 1206, 1210 (9th Cir.1981). The charge need not be technically precise as long as it generally informs the party charged of the nature of the alleged violations. *Id.* Moreover, where the issue is fully and fairly litigated at the administrative hearing, the Board may find an unfair labor practice even though no specific charge is made in the original complaint. *Clear Pine Mouldings, Inc. v. NLRB,* 632 F.2d 721, 728 (9th Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2317, 68 L.Ed.2d 841 (1981)....

*Industrial, Tech. and Prof. Employees Div., Nat'l Maritime Union v. NLRB,* 683 F.2d 305, 307–08 (9th Cir.1982). *See also NLRB v. Blake Const. Co.,* 663 F.2d 272, 279 (D.C.Cir.1981) (court will not enforce order absent a supporting allegation in the complaint *or* a "meaningful *opportunity* to litigate the underlying issue in the hearing itself.") (Emphasis added.)

Many similar cases have their genesis in *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). In *Mackay,* the NLRB filed a complaint alleging an illegal discharge, amended it to allege instead a refusal to re-employ, and then found that a wrongful discharge had in fact occurred. The Court stated:

Thus the respondent claims that it is found guilty of an unfair labor practice which was not within the issues upon which the case was tried. The position is highly technical. All parties to the proceeding knew from the outset that the thing complained of was discrimination against certain men by reason of their alleged union activities. If there was a current labor dispute the men were still employes [sic] by virtue of § 2(3), and the refusal to let them work was a discharge....

A review of the record shows that at no time during the hearings was there any misunderstanding as to what was the basis of the Board's complaint.

*Mackay,* 304 U.S. at 349–50, 58 S.Ct. at 912. Similarly, in *Rea Trucking Co. v. NLRB,* 439 F.2d 1065, 1066 (9th Cir.1971), we refused to set aside an unfair labor practice finding where the complaint alleged a discharge *because of* union activity and the NLRB found that the discharge was made to *discourage* union activity among employees who may never have engaged in such conduct.

In the case at bar, employees who were members of one union were discharged because they refused to switch to a different union. Whether this is characterized as termination for being a member of the first union or termination for not being a mem-

ber of the second union is largely a technical and semantic distinction. As the NLRB attorney said at the hearing, the two statements are just "reverse" methods of arguing the same point. Both parties understood the basis of the complaint.

In addition, the Company had ample opportunity to litigate the violation as found by the ALJ. In *NLRB v. Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 433*, 600 F.2d 770 (9th Cir. 1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980), we said:

> It is apparent that the issue of threats and violence [decided by the ALJ but not expressly set forth in the complaint] were [sic] fully and fairly litigated. The record is replete with evidence documenting the occurrences of these acts. For the most part, this evidence was corroborated and uncontradicted. Although the Union contends that [the] ALJ treated the incidents only as background, the ALJ in fact devoted two full pages to the incidents of violence, referencing his discussion with numerous citations to the evidentiary record. Furthermore, the Union did not move for a bill of particulars, did not object to the introduction of the evidence or move for a continuance, and cross-examined the relevant witnesses.

600 F.2d at 776. *Accord Industrial, Tech. and Prof. Employees Div., Nat'l Maritime Union v. NLRB*, 683 F.2d at 308.

The case at bar is similar to the case quoted above. The record contains uncontradicted evidence that the employees were not afforded the full statutory grace period to join the IBEW. The ALJ stated several times at the hearing that this failure was a central issue in the case, the Company did not object to such statements, and the ALJ devoted approximately ten fact-filled pages of his decision to that issue. Moreover, the Company examined the witnesses that gave the relevant testimony, and did not move for a continuance.

Finally, even if the Company had not understood the issue at the hearing, it was "fully litigated" in the sense that there was

no more exculpatory evidence that could have been introduced. Although the Company states in its opening brief that it could have proved a number of things to escape liability, it cites no authority for the proposition that the allegedly exculpatory evidence would be a defense to a charge of discharging the workers before the grace period expired. In its reply brief, the Company seems to recognize that it committed at least a "minor infraction" by terminating the employees before the end of the work day on Friday, but asserts that the employees were not prejudiced because they would have been terminated at midnight anyway. Lack of prejudice is not a defense to failing to give the full grace period.

We find no violation of the Company's due process rights.

## D. ENFORCEMENT OF THE BOARD'S ORDER

### 1. *Standard of Review*

We will enforce the Board's order if the Board's findings of fact are supported by substantial evidence in the record and if the Board correctly applied the law. *NLRB v. Nevis Industries, Inc.*, 647 F.2d 905, 908 (9th Cir.1981). The Board's interpretation of the Act is entitled to deference, and will be upheld if reasonably defensible. *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979).

*NLRB v. Carpenters Local Union No. 35*, 739 F.2d 479, 481–82 (9th Cir.1984).

### 2. *Substantial Evidence to Support Findings of Fact*

The Board's findings of fact regarding Merrow's status as a supervisor have been fully discussed above. There was substantial evidence in the record to support those findings.

The findings of fact regarding the Company's failure to grant the statutory grace period were also supported by substantial evidence. The testimony about the dates

and times the IBEW agreement was signed and the employees were discharged was uncontradicted.

### 3. *Application of Law*

Section 158(f) provides that it is not an unfair labor practice to require union membership *"after* the seventh day *following* ... the effective date of the agreement."* (Emphasis added.) The NLRB construed this language to mean that since the IBEW contract was signed on Friday, February 12, the Company had to wait until *after* Friday, February 19 to discharge employees who failed to join the IBEW.

The Board cites its own precedent to support this conclusion. In *J.W. Bateson Co.*, 134 N.L.R.B. 1654 (1961), for example, the Board held that a union security clause requiring membership "no later than" the seventh day following the beginning of employment violated federal law because it did not provide for the "full" seven day grace period. In *Tri-W Construction Co.*, 139 N.L.R.B. 1286 (1962), the Board found a violation from a union security clause requiring membership "as of the seventh day after the date of the contract" for workers already employed.

■ Given the wording of the statute, the Board's authority construing it as strictly as possible in favor of employees, and the deference due the Board's expertise in interpreting federal labor statutes, we conclude that the Board's interpretation is at a minimum "reasonably defensible." See *NLRB v. Carpenters Local Union No. 35*, 739 F.2d at 482. Furthermore, the Company did not challenge the Board's construction of the statute, but only insisted that it "substantially complied" with the statute and that any violation was minor and did not prejudice the employees.

### E. CONCLUSION

The Board's decision is affirmed and its order enforced.