**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ISLAND FILM PROCESSING CO., INC., d/b/a Kahala Kai Photo Service, Respondent.**

No. 85–7278.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 17, 1986.

Decided March 19, 1986.

Linda Dreeben, Washington, D.C., for petitioner.

Robert S. Katz, Honolulu, Hawaii, for respondent.

Before POOLE and BEEZER, Circuit Judges, and JAMESON,* District Judge.

JAMESON, Senior District Judge:

The National Labor Relations Board (NLRB) has applied to this court for enforcement of its order requiring Island Film Processing Co., Inc., dba Kahala Kai Photo Service (Kahala Kai), to bargain collectively with the International Longshoremen and Warehousemen's Union, Local 142 (Union). The NLRB found that Kahala Kai had committed an unfair labor practice by refusing to bargain collectively in violation of the National Labor Relations Act (NLRA) section 8(a)(5) and (1), 29 U.S.C. § 158(a)(5) and (1). Kahala Kai contends that because the active pro-union participation of its supervisors coerced employees in their right to vote, the NLRB improperly certified the Union. We agree with Kahala Kai and deny the application for enforcement.

## I. *Background*

Kahala Kai sells souvenir photographs to tourists on the island of Oahu, Hawaii. Kahala Kai maintains its headquarters at the Hilton Hawaiian Village, and operates

---

* The Honorable William J. Jameson, Senior United States District Judge, District of Montana, sitting by designation.

three satellite photolaboratories at Kewalo Basin, Paradise Cove and Tavana. Each laboratory operates independently of the other laboratories. Kahala Kai photographs tourists at various places of entertainment and dispatches runners to collect the film for processing, the laboratory processes the prints, and the runners return the finished product for sale to the tourists within the hour. Kahala Kai employs approximately 150 people.

The Union, on December 3, 1982, filed a representation petition seeking certification as the exclusive bargaining representative for 35 of Kahala Kai's employees.[1] Basically the bargaining unit excludes all employees except those working in the photolaboratories. Within each photolaboratory the darkroom employees operate separately from the laboratory technicians. A head printer oversees the darkroom employees, and a head checker oversees the laboratory technicians.

Following a pre-election hearing, held pursuant to section 9(c) of the NLRA, 29 U.S.C. § 159(c), the Regional Director determined the supervisory status of certain employees and filed a Decision and Direction of Election, dated January 31, 1983. The Director found that all head printers qualified as supervisors because they were able to grant time off and approve overtime, discipline darkroom staff, and effectively recommend pay increases, hiring or termination of employees. The parties stipulated that the head checkers Lenny Nichols at Paradise Cove, Vinny Zoccolante at Tavana, and Dwight Iwasa at Hilton Hawaiian Village were supervisors. The Regional Director found, however, that Clyde and Clayton Young, part-time checkers at Kewalo Basin, were not supervisors.[2] Unlike the head checkers, the Young brothers were paid an hourly rate and did not attend managerial meetings. The evening

prior to Clyde Young's testimony at the administrative hearing, Dwight Iwasa informed Clyde that Clyde possessed the requisite authority to discharge personnel. However, up to that time Clyde had never recommended termination, hiring or salary increases for employees. Further, each time Clyde faced an unusual problem, he would telephone Dwight Iwasa for advice on how to proceed.

Clyde Young served as the Union's "main organizer." The head printers, William Kuencer, Joseph Flanagan, Theodore Cobeen, Dean Hewitt and Alan Nalui, also encouraged employee support for the Union. Kuencer and Flanagan initiated the Union movement. They visited the Union hall to discover the procedure for organizing. Flanagan urged employees to attend the first union meeting. Many of the head printers also attended the meeting. Kuencer, Cobeen, Hewitt and Nalui signed union authorization cards in the presence of employees. Nichols, a head checker and previously a head printer, testified that a type of "underground" was formed in order to "keep it [the union movement] quiet from the management," and to "talk it up to get support for the Union." Nichols described the pre-petition atmosphere: "[E]verybody in Kahala Kai was kind of apathetic to everything. It had been so bad, that we had to get support [for the Union] and say, well, this has got to go no matter what. You know, if we get threatened or whatever, we have got to stick with it, to get the commitment."

Prior to the election head printers often spoke to employees in favor of the Union. Flanagan and Kuencer engaged in conversations favoring the Union "almost every night." Flanagan explained to employees that he "saw good things about [the Union], ... it would help us to have job securi-

---

1. The bargaining unit, by stipulation, included all regular full-time and part-time employees of the Employer including printers, feeders, negative driers, soupers, runners, supply clerks, packagers and checkers employed [at all four locations]; excluding confidential employees, photographers, clerical and professional em-

ployees, guards and supervisors as defined in the Act.

2. Clyde Young testified at the pre-election hearing; Clayton Young did not. Kahala Kai contests only Clyde Young's status since he was the Union's main organizer.

ty, better benefits. The company wouldn't be able to just take away paid vacations.... [W]e would have things in writing that the company would have to stick to." Kuencer indicated to employees that "The job would be rougher if [they] didn't vote," and explained that if the Union lost the election "[t]hings will be about the same, there will be no vacations, vacation pay, and ... the job situation wouldn't be moving up for seniority people that had been working for the company...." A few days before the election Kuencer stated that if he could vote, he would vote in favor of the Union. The other head printers also engaged in conversations and indicated their pro-union bent.

However, none of the supervisors directly threatened employees. A bargaining unit employee, Frances DeCosta, testified that although she frequently engaged in conversations with Kuencer, she never felt threatened by him. She was able to freely express her views.

In response to the Union campaign, Kahala Kai's acting president, Lee Fleishman, clearly expressed his opposition to the Union during a weekly managerial meeting. He threatened to close down the photolaboratories and lay off employees if the Union won. The head printers relayed this message to employees.

The Union held a secret ballot election on March 3, 1983. Twenty-six employees cast their ballots. Fifteen employees voted for the Union and seven voted against, with four ballots challenged. The challenged ballots were not sufficient to change the election results. Kahala Kai timely objected to the propriety of the pre-election supervisory participation.[3]

On September 12, 1983, the hearing officer recommended that all of Kahala Kai's objections be overruled.[4] The hearing officer addressed two issues: (1) whether Clyde Young's status had changed subsequent to the pre-election hearing, and (2) whether supervisory participation invalidated the election. Addressing the first issue, the hearing officer noted that on January 3, 1983, Lee Fleishman had informed Clyde that he would be converted to salary, rather than hourly pay, and that he was now a manager. Thereafter, however, Clyde attended only one managerial meeting, his working hours were reduced, and he was shifted to different work locations. Based on these facts, the hearing officer concluded that Clyde was still an employee.

Addressing the second issue, the hearing officer summarized:

Thus, in all circumstances I conclude that the record has no evidence of any employee fear of supervisory retaliation in the event they vote in a way not supported by the supervisors. I find that in view of the supervisors in question being

**3.** Kahala Kai formally objected to the election on March 9, 1983. Because Kahala Kai failed to timely submit evidence in support of its objections, the Regional Director certified the Union on April 6, 1983. Kahala Kai requested review of that decision. The NLRB remanded to the Regional Director. The Regional Director on July 12, 1983, issued a second supplemental report granting a hearing to be held August 11, 1983. The hearing officer reported that the employer's objections to the election had no merit. Kahala Kai again appealed the hearing officer's report. The NLRB affirmed the decision of the hearing officer on April 3, 1984.

**4.** Kahala Kai made three objections:
1. The Union, by and through its agents, and through parties affiliated, sponsored and embraced by the Union, engaged in, and improperly condoned impermissible supervisory sponsorship and electioneering, and through these and other violations of the Act, and conduct in violation of established NLRB election conduct precedent, coerced and restrained employees in the exercise of their rights guaranteed under the Act, which acts and misconduct irreparably destroyed the laboratory conditions requisite to, and necessary for, the occurrence of a free expression of employee sentiment.
2. During the laboratory period, the Petitioner, through its agents, intimidated employees into supporting Petitioner.
3. By these and other acts and conduct, Petitioner intimidated, restrained, and coerced the employees in the exercise of their rights guaranteed under Section 7 of the Act.
For the reasons noted, the hearing officer overruled objection No. 1. Because no evidence was submitted in support of objections Nos. 2 and 3, the hearing officer recommended they be summarily overruled.

"minor supervisors" in terms of both their actual exercise of authority and the clear authority of Fleishman [Kahala Kai's acting president], that it is unlikely employees had any real basis to have such a fear. I finally conclude that by the dissemination of the employer's clear threats to shut down in the event of a union victory, the employer's position was known to the employees.

The NLRB adopted the hearing officer's recommendation and issued a Decision and Certification of Representation.

■ After the Union obtained certification, Kahala Kai, beginning June 4, 1984, refused to bargain collectively with the Union. On November 1, 1984, the General Counsel issued a complaint, based on charges by the Union alleging that Kahala Kai refused to recognize, bargain, and furnish information to the Union, in violation of section 8(a)(5) and (1) of the NLRA, 29 U.S.C. § 158(a)(5) and (1). In answer, Kahala Kai admitted the allegations, but asserted *improper certification* of the Union for the reasons urged in its election objections. The NLRB in its decision issued April 5, 1985, granted the General Counsel's motion for summary judgment because

> the points the Company raise[d] in connection with its assertion of "special circumstances" constitute[d] nothing more than a reiteration of its position with respect to its objection to the election alleging improper supervisory involvement in the Union's election campaign.

The NLRB concluded that Kahala Kai engaged in unfair labor practices violating Section 8(a)(5) and (1), and ordered Kahala Kai to cooperate with the Union as re-

quired by the NLRA. Kahala Kai seeks review of this order.[5]

## II. Contentions

Kahala Kai contends that (1) Clyde Young is a supervisor within the meaning of section 2(11) of the NLRA, 29 U.S.C. § 152(11), and (2) the supervisors' campaign activities precluded employees from exercising their right to an uncoerced vote for Union representation. For these reasons Kahala Kai urges this court to deny enforcement of the NLRB's order.

## III. Standard of Review

■ This court conducts a limited review of the NLRB's underlying decision. The NLRB possesses wide discretion in determining whether an individual is a supervisor. *See George C. Foss Co. v. NLRB,* 752 F.2d 1407, 1410 (9th Cir.1985). It retains the same broad discretion in determining the propriety of the election process. *NLRB v. Lorimar Productions, Inc.,* 771 F.2d 1294, 1300 (9th Cir.1985). Nevertheless, the NLRB's order will be upheld only if it correctly applies the law and if it rests upon substantial evidence. *NLRB v. Best Products Co., Inc.,* 765 F.2d 903, 906 (9th Cir.1985).

## IV. Supervisory Status of Clyde Young

■ Kahala Kai contends that Young possessed the requisite "supervisory powers."[6] A "supervisor" must be able to hire, transfer, suspend, layoff, recall, promote, discharge assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, *or* effectively to recommend such action, *if in connection with* the fore-

---

5. Because an election certification does not constitute a final order, but an order to bargain following an unfair labor practice proceeding does, Kahala Kai refused to bargain in order to obtain review of these issues by this court. Kahala Kai properly preserved its objection in both the certification and unfair labor practice proceedings. *See NLRB v. Belcor, Inc.,* 652 F.2d 856, 858 (9th Cir.1981).

6. The NLRB urges that Kahala Kai failed to raise its objection to Young's status below, and,

thus, did not preserve its objection for review by this court. *See NLRB v. Best Products Co., Inc.,* 765 F.2d at 909. However, the NLRB granted summary judgment against Kahala Kai, because it simply "reiterated" its objections. In its prior decision, the NLRB discussed Young's supervisory status even though Kahala Kai merely objected to supervisory involvement. Thus, it appears Kahala Kai adequately preserved its objection to Young's status.

going the exercise of such authority is not of a merely routine or clerical nature, but *requires the use of independent judgment.*

29 U.S.C. § 152(11) (emphasis added). A supervisor need only possess one of the enumerated powers, but must do so in conjunction with an exercise of independent judgment. *George C. Foss, Co.,* 752 F.2d at 1410; *Walla Walla Union-Bulletin, Inc. v. NLRB,* 631 F.2d 609, 613 (9th Cir. 1980); *Global Marine Development of California, Inc. v. NLRB,* 528 F.2d 92, 94 (9th Cir.1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 83 (1976).

■ The giving of routine minor orders does not make an employee a statutory supervisor. *George C. Foss, Co.,* 752 F.2d at 1410. Before Clyde ever took action in an unusual situation he would consult Dwight Iwasa for instructions on how to proceed.

■ Despite Fleishman's insistence that Clyde could terminate an employee, Clyde never effectively recommended termination, hiring or pay increases. During the pre-election period, rather than continuing Clyde's steady work hours, Kahala Kai reduced his hours. Clyde testified that he became an "on call" type of employee. No evidence suggests Clyde exercised supervisory powers or exercised independent judgment. The NLRB upon substantial evidence found Clyde to be an employee.[7]

## V.  *Supervisory Pro-Union Conduct*

■ Active supervisory participation in a union organizing campaign destroys laboratory conditions and prevents employees from exercising an uncoerced vote. Such involvement requires an election to be set aside. *Wright Memorial Hospital v. NLRB,* 771 F.2d 400, 404 (8th Cir.1985); *Fall River Savings Bank v. NLRB,* 649 F.2d 50, 56 (1st Cir.1981). The courts, however, have never required actual proof of coercion. Supervisory activity need only "reasonably tend" to have a coercive effect on or "likely to impair" an employee's

choice. *ITT Lighting Fixtures v. NLRB,* 658 F.2d 934, 937 (1981), *appeal on remand,* 712 F.2d 40 (2nd Cir.1983), *cert. denied,* 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 833 (1984). Implied threats of retaliation suffice to taint an election. *See Wright Memorial Hospital,* 771 F.2d at 404; *Worley Mills, Inc. v. NLRB,* 685 F.2d 362, 365 (10th Cir.1982); *Fall River Savings Bank,* 649 F.2d at 57.

The NLRB rested its decision on a distinction between "major" and "minor" supervisors. The hearing officer found that since head printers possessed only "minor" supervisory powers, their pre-election involvement could not have created a coercive atmosphere. Kahala Kai contends that such distinction is inapplicable. The Court of Appeals for the Fourth Circuit has held:

> The Board's designation of ... "minor supervisors" is not supported by the evidence or the law. The Act does not grade supervisors as major or minor. An individual is either a supervisor or an employee.

*Turner's Express, Inc. v. NLRB,* 456 F.2d 289, 291 (4th Cir.1972) (Footnote omitted). Section 2(11) of the NLRA, 29 U.S.C. § 152(11), makes no mention of "minor" supervisors.

In *ITT Lighting Fixtures,* the court, in denying enforcement of the Board's order, held that "the criteria developed by the Board for determining whether a supervisor [is] 'major' or 'minor,' and whether the exercise of a supervisor's authority could have an impact on the laboratory condition for voting," cannot be made "simply by labeling a supervisor as 'minor'; instead there must be consideration of both the extent of the supervisor's authority and the extent of his pro-union activity." 712 F.2d at 43–44. The court held further:

> It seems clear that in addition to the Board's criteria which are based solely on the power to retaliate, there should be included the power to reward. This power consists of giving one employee an advantage over another. The authority

7. We note also that Clyde Young voted in the election unchallenged.

to grant rewards in the form of transfer, or favorable work assignments, or selection to work overtime to make more money, or excuse from overtime, can be just as coercive in the election process as the authority to issue written warnings.

*Id.* at 44.

We need not decide in this case whether a distinction between "major" and "minor" supervisors can ever be a permissible element in an analysis of the coercive impact of pre-election involvement by supervisors. In other contexts, it may prove appropriate to consider whether the potential for coercion was reduced where a supervisor possessed little actual power over employees, although the lack of substantial authority may instead be evidence that the individual was not in fact a statutory supervisor.

In this case, however, the hearing officer did not adequately support his finding that the supervisors possessed only "minor" authority. He did not give careful consideration to the extent of the supervisors' authority to "reward" employees by approving over-time and granting time-off. Moreover, the Regional Director, in the pre-election hearing, had found the supervisors to have authority to discipline workers, and effectively recommend termination and raises in the pay of employees. These individuals, who had been identified by official NLRB action as supervisors with the power to discipline employees, continued to campaign for the union right up until the election. Consequently, the hearing officer's classification of these individuals as "minor" supervisors appears to be a conclusory appellation adopted after the decision had already been made to uphold the election.

In reaching its decision, the NLRB applied a two-prong test. An affirmative answer to either prong would have required the election to be set aside. First, the NLRB asked whether the supervisors' conduct created an impression that the employer favored the union, and second, whether the supervisors' conduct created a fear of future retaliation. Kahala Kai does not argue that the employees were unaware of its anti-union position. It only contends that the supervisors created a fear of future retaliation.

■■■ Reviewing the second prong, this court has applied the following standard: The type of solicitation which invalidates a union selection process is one that must "contain the seeds of potential reprisal, punishment, or intimidation [or] the involvement of the supervisors does not rise to the level of supervisory 'solicitation.' "

*Global Marine,* 528 F.2d at 95 (quoting *NLRB v. WKRG–TV, Inc.,* 470 F.2d 1302, 1316 (5th Cir.1973)). We review the record as a whole to determine whether the head printers' conduct laid the foundation for potential coercion of the employees.

■■■ .The head printers initiated the union organizing campaign and overcame employee apathy pervading Kahala Kai. Nichols testified that the supervisors established a type of "underground." Most of the head printers organized and attended the initial union meeting. They also signed authorization cards in the presence of other employees. These actions were highly visible among employees.[8]

---

**8.** The NLRB, adopting the *Ideal Electric* rule, contends that pre-petition involvement must not be considered in determining whether supervisory involvement tainted the election. (*See Ideal Electric and Manufacturing Co.,* 134 NLRB 1275, 1277–78 (1961)). This court, however, has taken into consideration such pre-petition activity. It has refused to mechanically apply such a rule.

Ideal Electric makes clear that the rule is simply an evidentiary device calculated to render irrelevant upon a post election contest, conduct "too remote" to have interfered with the employees' exercise of free choice....

*NLRB v. R. Dakin and Co.,* 477 F.2d 492, 494 (9th Cir.1973). *See also Catholic Medical Center of Brooklyn and Queens, Inc. v. NLRB,* 589 F.2d 1166, 1173 (1978), *appeal on remand,* 620 F.2d 20 (2nd Cir.1980). *Cf. Global Marine,* 528 F.2d at 94–95 (reviewed whether signing of authorization cards and attendance at union meeting invalidated union selection process). In the instant case the head printers' conduct began prior to the filing of the petition and lasted up until the election. Continuous involvement, such as here, is not "too remote" to be considered.

Further, the head printers engaged in almost continuous conversations at the work place. They enumerated the many benefits a union would provide, and warned, among other things, that without a union employees would not receive vacations or seniority. Kuencer cautioned that "the job would be rougher" without union support. Two nights prior to the election, he told an employee that if he could, he would vote for the Union. These pervasive conversations clearly expressed the head printers' Union preference.

Each of the five head printers vocalized their Union support among the twenty-six employees who voted. Thus, the head printers exerted significant influence over a small group of employees. A switch of only four votes, not counting challenged ballots, would have resulted in a tie vote.[9] *See ITT Lighting*, 712 F.2d at 45; *N.L.R.B. v. Klinger Electric*, 656 F.2d 76, 86 (5th Cir.1981). The head printers' constant vocal support among such a small group of employees, combined with the supervisors' ability to effectively recommend pay increases, reprimand employees, and approve overtime, together with their assurance of benefits if the Union prevailed and unfavorable consequences if the Union lost the election, sowed the seeds of reprisal.[10] The NLRB, thus, improperly certified the Union as Kahala Kai employees' exclusive bargaining representative.

**9.** In *ITT Lighting*, the court noted that "51 employees could possibly have been influenced by the pro-union activity of five of the group-leaders" and that a switch of only 12 votes could have changed the result of the election. The court continued:

> Thus, we cannot say that the election was held in an atmosphere " 'free not only from interference, restraint or coercion violative of the Act, but also from other elements which prevent or impede a reasoned choice.' " *ITT Lighting Fixtures*, 658 F.2d at 936, quoting *Sewell Manufacturing Company*, 138 N.L.R.B. 66, 70 (1962).

712 F.2d at 45. The same is true here. Twenty-six ballots were cast, and five supervisors engaged in extensive pro-union activities.

**10.** We find this case factually distinguishable from most of the cases cited by the NLRB. In those cases the ratio of supervisors to employees

## VI. Conclusion

We conclude that (1) there was substantial evidence to support the Board's finding that Clyde Young was not a supervisor; but (2) the head printers' pro-union supervisory conduct tainted the election. The NLRB's application for enforcement of its order is denied.

was much lower and the supervisors' "pro-union" activity less pervasive, consisting of attending union meetings, passing out authorization cards, and expressing personal support for the union. *See, e.g., Wright Memorial Hospital*, 771 F.2d at 405–06 (three charge nurses and 147 employees); *Worley Mills, Inc.*, 685 F.2d at 364 (three supervisors and 51 employees); *Klingler Electric Corp.*, 656 F.2d at 86 (Union won by a margin of 32 to 15, excluding votes of nine "headpersons"). The head printers here went beyond the conduct of the supervisors in these cases. In addition to other conduct, the head printers engaged in continuous conversations with employees up until the time of the election and predicted unfavorable consequences if the employees failed to vote for the Union. The five head printers exerted considerable influence over the 26 potential bargaining unit employees, thus destroying the necessary "laboratory" conditions.