**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CHICAGO METALLIC CORPORATION, Respondent.**

No. 85–7458.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 1986.

Decided July 17, 1986.

John Walsh, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., for petitioner.

Kenneth E. Ristau, Jr., William D. Claster, Gibson, Dunn, & Crutcher, Newport Beach, Cal., for respondent.

Before WRIGHT and NELSON, Circuit Judges, and ROSENBLATT,* District Judge.

EUGENE A. WRIGHT, Circuit Judge:

This application for enforcement of National Labor Relations Board orders[1] presents the question whether one perceived by employees as a supervisor, although not satisfying the statutory criteria of 29 U.S.C. § 152(11), nevertheless may be accorded supervisor status for purposes of unfair labor practice charges arising from union campaigning before a representation election. We consider the relevancy of employees' perceptions of supervisor status in the context of two Board decisions: one certified a representation election and the other prohibited the company from threatening employees with discharge for union campaigning on company time.

## BACKGROUND

Chicago Metallic Corporation manufactures steel superstructure for ceilings in a plant in Vernon, California.

The Sheet Metal Workers' Union petitioned the Board for certification as the bargaining representative of the production and maintenance employees at the Vernon facility. The Company and Union agreed to an election to be held on November 5, 1981 among "[a]ll production and maintenance employees and shipping and receiving· employees, including leadpersons...."

Ralph Picazzo was an assistant production leadman and a maintenance leadman. Knowing of the Union's organizing campaign, he signed a Union authorization card, attended its meetings, and talked with other employees about supporting the Union.

About ten days before the election, shipping leadman Jerry Colvard, a Union opponent, and employee Steve Kofeik told plant manager Donald Moore that Picazzo was "campaigning for the Union on company time." Four days later, Moore told Picazzo

---

* Hon. Paul G. Rosenblatt of the District of Arizona.

1. The Board's decisions and orders are reported at 273 NLRB No. 207 and 275 NLRB No. 122.

to discontinue that activity or be subject to termination.

Four days before the election, Picazzo asked production helper, Brent Yankee, how he intended to vote and encouraged him to vote for the Union. Yankee did not agree with those suggestions. Picazzo threatened him, "If you tell anyone what I've told you, I'll get you, I'll kill you."

Yankee reported the threat to leadman Patterson, who told plant manager Moore. Moore assigned a security guard to Yankee's shift.

Two or three days before the election, Yankee told Larry Colvard of Picazzo's threat and Larry told his brother, Jerry. Employees Negron and Freeland also learned of the threat.

Larry Colvard testified that Picazzo told him, "If the Union wins, [Jerry Colvard] will be gone." Written on the bathroom wall was the threat, "Death to the Dog Brothers," referring to the Colvards. Finally, he testified that Yankee's car windows had been smashed. The date of that occurrence is unclear.

Picazzo told employee Freeland that Jerry Colvard would be fired if the Union won and he warned Freeland against voting against the Union. Moore reportedly assured both Freeland and Jerry Colvard that their jobs were secure.

The election resulted in a 19–10 vote for the Union. The Company challenged only Picazzo's ballot, on the ground that he was a supervisor. On November 10, Moore discharged Picazzo for threatening and intimidating employees before and after the election.

PROCEEDINGS BELOW

The Company filed election objections on November 12. The Union then filed an unfair labor practice charge alleging that the Company had unlawfully threatened and discharged Picazzo because of his Union activities. The Company's election objections were consolidated with the unfair labor practice allegations. Hearings were held on July 13 and 14.

On January 30, 1985, the Board affirmed the ALJ's findings that the Company violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by threatening to discharge Picazzo if he continued to campaign for the Union.[2] It concluded that the election objections lacked merit and certified the Union.

The Board's General Counsel alleged that the Company had violated Section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1), by refusing to bargain with, or furnish information to, the Union. The Board granted the General Counsel's motion for summary judgment.

DISCUSSION

I. *Election Objections*

A. *Supervisor Status*

The enforceability of the order certifying the election hinges on Picazzo's status. We recognize that the Board has wide discretion in determining whether an employee is a supervisor. *NLRB v. Island Film Processing Co.*, 784 F.2d 1446, 1450 (9th Cir.1986). Its determination will be followed if supported by substantial evidence and it applies the law correctly. *Id.;* *NLRB v. Best Products Co.*, 765 F.2d 903, 906 (9th Cir.1985).

Section 2(11) of the Act provides: The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

The existence of any one of the enumerated powers combined with "inde-

---

**2.** Not challenged in this appeal, the Board affirmed also the ALJ's conclusion that Chicago Metallic did not violate Section 8(a)(3) and (1) by discharging Picazzo.

pendent judgment" suffices to confer supervisory status. *Island Film,* 784 F.2d at 1451; *George C. Foss Co. v. NLRB,* 752 F.2d 1407, 1410 (9th Cir.1985). We look to actual duties, not merely job title or classification. *International Longshoremen's Association v. Davis,* — U.S. —, 106 S.Ct. 1904, 1915 n. 13, 90 L.Ed.2d 389 (1986).

■ In borderline cases, it is appropriate to consider "secondary indicia" in determining whether one is a supervisor. II C. Morris, *The Developing Labor Law* at 1454 (2d ed. 1983). One secondary factor recognized by the Board is whether the person is perceived as a supervisor. *Id.; see also Helena Laboratories Corp.,* 225 NLRB 257, 265 (1976) (lead lady accorded supervisor status where company held her out to employees as such), *modified,* 557 F.2d 1183 (5th Cir.1977); *Aurora & East Denver Trash Disposal,* 218 NLRB 1, 10 (1975) (foreman who claimed he was mere conduit for employer's orders to employees was supervisor where he led other employees to believe he was one); *Gerbes Super Market, Inc.,* 213 NLRB 803, 806 (1974) (department manager was supervisor where he was regarded by fellow employees as their "boss" and was considered person in authority); *Broyhill Co.,* 210 NLRB 288, 294 (1974) (foreman a supervisor where company placed him in a position such that employees reasonably believed that he spoke on management's behalf), *enf'd,* 514 F.2d 655 (8th Cir.1975).

■ The Supreme Court has recognized that, in election cases, acts of perceived supervisors are to be accorded the same weight as those of actual supervisors. *See International Association of Machinists v. NLRB,* 311 U.S. 72, 79–80, 61 S.Ct. 83, 88–89, 85 L.Ed. 50 (1940). We have such a situation here.

Whether Picazzo qualifies as a "statutory" supervisor is a close question. He assisted leadman Kreuger in maintaining proper production work schedules. He directed employees in their job performance. He was assigned no manual chores.

He wrote weekly employee evaluations and prepared and issued written disciplinary warnings and notices to employees, including suspension notices. When the merits of those notices were challenged, Picazzo referred the employee to plant manager Moore or superintendent Williams.

Moore testified that Picazzo and Kreuger had authority and discretion to take disciplinary action against employees. Picazzo's primary role in the disciplinary process was highlighted by the termination of O'Shaughnessey. Picazzo effectively recommended his firing by informing Kreuger that O'Shaughnessey had left his machine unattended repeatedly.

When instructed, Picazzo transferred employees from one assignment to another. He made overtime assignments although the actual need for overtime was decided by Williams.

Picazzo trained new employees, served as plant safety representative and attended management meetings where production and expansion issues were discussed.

On this evidence alone, we cannot say that Picazzo meets the statutory criteria of Section 2(11). But there is more. Several employees testified to their belief that Picazzo had the authority to discipline and issue written reprimands that were signed by him as "company supervisor." They considered him to be in charge of inspection, training and supervision. Their contact with management was through Picazzo.

Plant manager Moore testified that Larry Colvard and Freeland believed that Picazzo had the power to fire them. Kosiek testified that he understood that Picazzo supervised production and completed warning slips and evaluations on employees.

Significantly, the ALJ concluded:

The fact that the employees may perceive Picazzo as a supervisor when they receive the warnings from him, and see his signature on the line labelled 'Signature of Supervisor,' is not determinative because the facts herein show that Picaz-

zo is not exercising supervisory authority.

■ This conclusion cannot stand. In such borderline cases where satisfaction of the statutory criteria is fairly debatable, the perception of fellow employees weighs more heavily. An employee who technically may not satisfy the statutory criteria of Section 2(11) nevertheless may be accorded supervisory status when he is perceived to be a supervisor by other employees.

### B. *The Election*

Chicago Metallic asserts that the Board erred in not setting aside the election. It argues that an atmosphere of fear and coercion disturbed the conditions necessary for a free election. We agree.

■ The Board retains broad discretion in determining the propriety of the election process. *Island Film,* 784 F.2d at 1450. We evaluate coercive conduct under the Board's "laboratory conditions" standard. *NLRB v. Hudson Oxygen Therapy Sales Co.,* 764 F.2d 729, 732 & n.2 (9th Cir.1985). "Coercive misconduct only warrants the setting aside of an election when it 'so influenced potential voters that a free choice [became] impossible.'" *May Department Stores Co. v. NLRB,* 707 F.2d 430, 432 (9th Cir.1983) (quoting *NLRB v. Advanced Systems, Inc.,* 681 F.2d 570, 575 (9th Cir.1982)).

■ The Board found expressly that: (1) Picazzo made threats of job reprisals and physical harm to employees who opposed the Union, (2) following one such instance, the threatened employee's car was vandalized, (3) graffiti on the plant's bathroom wall threatened physical harm against two anti-union employees, and (4) knowledge of these events was widespread throughout the unit. Even more telling is the closeness of the vote. A difference of only five votes could have changed the outcome of the election. *See Hickman Harbor Service v. NLRB,* 739 F.2d 214, 220 (6th Cir. 1984) (selective misconduct in small unit and close vote persuade court to set aside representation election).

As the company asserts, Picazzo's supervisory role or appearance exacerbated the coercive effect of his threats.

Active supervisory participation in a union organizing campaign destroys laboratory conditions and prevents employees from exercising an uncoerced vote. Such involvement requires an election to be set aside.... The courts, however, have never required actual proof of coercion. Supervisory activity need only 'reasonably tend' to have a coercive effect on or 'likely to impair' an employee's choice.... Implied threats of retaliation suffice to taint an election.

*Island Film,* 784 F.2d at 1451 (citations omitted). *See also NLRB v. Hawaiian Flour Mill, Inc.,* 792 F.2d 1459 (9th Cir. 1986) (supervisors' prounion conduct did not reasonably tend to coerce employees).

The Board erred in classifying Picazzo's threats as third-party misconduct, which must be more aggravated than Union or employer misconduct to overturn an election. *See May Department Stores Co.,* 707 F.2d at 432. The threats against several employees were serious. Known antiunion employees were targeted. Effective debate was chilled by the unit's knowledge that those employees who expressed union views risked physical harm, property damage or job reprisal.

In sum, the totality of the circumstances demonstrates that the election was conducted in an atmosphere of fear and reprisal exacerbated by the fact that the threats were made by a domineering person perceived as a supervisor. The threats spread rapidly through the small unit. Finally, the vote was relatively close.

■ Given the Board's finding that Picazzo's threats "reasonably tended to coerce and intimidate [certain] employees in the exercise of their rights protected under the Act," the election must be set aside. *See Island Film,* 784 F.2d at 1451. Because the Board erred in certifying the Union, Chicago Metallic did not commit an unfair labor practice by refusing to bargain. *NLRB v. West Coast Liquidators,*

*Inc.,* 725 F.2d 532, 534 (9th Cir.1984). Enforcement is denied for those parts of the Board's orders dealing with the election objections and refusal to bargain with the Union.

## II. *Threats to Discharge Picazzo*

Chicago Metallic argues that the Board erred in concluding that it violated Section 8(a)(1) when it warned Picazzo not to campaign for the Union on "company time". Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" Section 7. Section 7 guarantees employees the right to self-organization. 29 U.S.C. § 157.

■ The right to self-organization must be balanced against an employer's right to control its business. *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 797–98, 65 S.Ct. 982, 985–86, 89 L.Ed. 1372 (1945); *Hughes Properties, Inc. v. NLRB,* 758 F.2d 1320, 1321 (9th Cir.1985). In *Republic Aviation,* 324 U.S. at 803 & n. 10, 65 S.Ct. at 987 & n. 10, the Supreme Court upheld the validity of the Board's rules defining the presumptive validity or invalidity of solicitation bans.

■ "A ban on all solicitation during working hours is presumptively valid, but a ban on all solicitation during non-working hours is presumptively invalid." *Hughes Properties,* 758 F.2d at 1322. Non-working hours include lunch or rest periods on company property. *Republic Aviation Corp.,* 324 U.S. at 803 n. 10, 65 S.Ct. at 988 n. 10.

The Company argues that a ban on solicitation during "company time" should be presumptively valid. Neither the Supreme Court nor this court has considered such a ban.

In *Florida Steel Corp. v. NLRB,* 529 F.2d 1225, 1231 (5th Cir.1976), the Fifth Circuit upheld the Board's findings that such a rule was overly broad and violative of Section 8(a)(1). It reasoned:

> The average ... employee—through whose eyes the validity of the no-solicita-

tion rule is measured ...—could easily interpret a prohibition of solicitation 'on the company's time' as barring solicitation during the entire time the employee was 'clocked in', including such non-working times as rest periods and coffee breaks.

*Id.; Accord James H. Matthews & Co. v. NLRB,* 354 F.2d 432, 441 (8th Cir.1965) (rule forbidding union solicitation on company time held invalid), *cert. denied,* 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966); *NLRB v. Miller,* 341 F.2d 870, 873–74 (2d Cir.1965) (same).

Similarly, the Board has found bans on solicitations during company time violative of Section 8(a)(1). *Cerock Wire & Cable Group, Inc.,* 274 NLRB No. 111, slip op. at 9 (1985); *Gemco,* 271 NLRB 1190, 1197 (1984).

The Company cites no cases, and we have found none, upholding a ban on solicitations during company time. The phrase is ambiguous and the context here does not save it. "[T]he risk of ambiguity must be held against the promulgator of the rule rather than against the employees who are supposed to abide by it." *Miller,* 341 F.2d at 874.

■ The Company argues that it did not violate Section 8(a)(1) because Picazzo was a supervisor. Generally, threats directed at supervisors for pro-union activities or sympathy do not constitute unfair labor practices. *See International Longshoremen's Association,* 106 S.Ct. at 1908 n.4 (employer does not commit unfair labor practice when it fires supervisor for union-related reasons); *George C. Foss Co.,* 752 F.2d at 1409 n.1 (federal labor law protects employees but not supervisors from being discharged for their union activity or status).

■ Here, unlike the electioneering analysis, we look to Picazzo's actual duties. When considering Chicago Metallic's treatment of Picazzo, the perceptions of other employees are irrelevant. As we have noted, substantial evidence supports the Board's conclusion that Picazzo does not

meet the statutory criteria of 29 U.S.C. § 152(11) for supervisor status. Thus, we hold that he is not a supervisor for purposes of the Union's Section 8(a)(1) claim.

Because Picazzo does not qualify for supervisor status, the Company's warnings for campaigning on company time constitute an unfair labor practice. That portion of the Board's order published at 273 NLRB No. 207 dealing with threats of discharge for Union campaigning will be enforced.

ENFORCEMENT GRANTED IN PART, DENIED IN PART.