NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

COLOR ART, INC.—OFFICE
INTERIORS DIVISION,
Respondent.

No. 90–2063.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 9, 1991.

Decided May 3, 1991.

Rehearing Denied June 5, 1991.

Paul Hitterman, Washington, D.C., for petitioner.

Stephen W. Skrainka, St. Louis, Mo., for respondent.

Before ARNOLD, Circuit Judge, FLOYD R. GIBSON and BRIGHT, Senior Circuit Judges.

ARNOLD, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order requiring Color Art to bargain with Local 610 of the Miscellaneous Drivers, Helpers, Health Care, and Public Employees Union. Behind Color Art's refusal to negotiate is a contested representation election. Over Color Art's objections, the Board certified a bargaining unit of the union after a very close election—the union's margin of victory was two votes. The wellspring of Color Art's objections was the pro-union activities of one Elmo Davis, a shipping supervisor. Color Art has maintained since soon after the election that Davis improperly influenced the outcome. His freely expressed union sympathies, when combined with what the company characterizes as his sub-

stantial authority as a supervisor, allegedly created the reasonable possibility of coerced voting. Because our review convinces us that the Board's decision is supported by substantial evidence in light of the whole record, we grant the Board's petition to enforce its order to bargain.

## I.

Color Art sells office furniture. It also offers interior-design services. The company is based in St. Louis and operates in that metropolitan area. The disputed election at the hub of this case involves the twenty-two Color Art employees who work in the company's warehouse and delivery operations. Those employees assemble, deliver, install, and service the products sold by Color Art. Elmo Davis supervises ten of these twenty-two workers. Those ten employees staff the company's delivery trucks in two-person teams. Under Davis's direction they load the trucks, make their assigned deliveries, and then return to the warehouse to help prepare the next day's deliveries. If less than five trucks are needed to carry that day's load, some of the drivers and their helpers remain in the warehouse, doing whatever Davis decides needs to be done in preparation for later deliveries.

Davis is part of Color Art's managerial team. At least three people are parallel to Davis in the managerial structure: the office manager, the warehouse manager, and the service manager. Davis and these three other first-level supervisors report to Color Art's operations manager. Terry Baum, who was operations manager until just before the disputed election, testified that (in addition to informal contacts) he tracked Color Art's operations through weekly meetings with each supervisor. T. 464. Color Art's President and its Executive Vice President supervise the operations manager.

The leading case in our Court regarding a supervisor's effect on a union election is *Wright Memorial Hospital v. NLRB*, 771 F.2d 400 (8th Cir.1985). In *Wright*, the pro-union activities of a group of charge nurses—nurses who directed care on individual hospital wings—were the

basis for a challenge to the Board's certification of a union for the non-supervisor nurses. The charge nurses handed out authorization cards, spoke in the union's favor, and wore pro-union buttons. In granting the Board's petition to enforce, we applied the legal standard for this kind of dispute. An election cannot stand if there is a reasonable possibility that the coercive potential of the supervisor's union support could have affected the outcome of the election. *Wright*, 771 F.2d at 404. Our reasoning in that case demonstrates that a number of considerations are relevant in coming to a legal conclusion about the atmosphere surrounding the election: the duration and intensity of the supervisor's activities; the degree of independent power possessed by the supervisor, as a practical matter, over those he supervised; and the employee's perceptions of the supervisor's power, and of his willingness to use that power against them if they opposed the union.

The extent of Davis's pro-union activities is not in dispute. The parties agree, and the Hearing Officer found, that supervisor Davis demonstrated his sympathies early and often. He attended two organizational meetings for the union. Indeed, he encouraged other employees to attend those meetings too. After the second of those meetings, Davis told an employee he supervised, David Dalton, to compile a list of promises the company had made to various employees and broken. In several conversations with different groups of employees (some of whom worked for Davis, some of whom did not), Davis promoted the union cause with stories about his own poor treatment by Color Art. On the day of the election, and in view of several eligible voters, Davis bet another supervisor that the union would win. When the election went his way, Davis invited several employees to go celebrate. Though Color Art was not wise to Davis's sentiments until the eve of the election, Davis made his views known to the eligible voters in this variety of ways. Thus, as in *Wright*, this Court is faced with extensive supervisor support of the union. That fact marks the beginning rather than the end of our inquiry into the potential

that this election was less than free. *Wright*, 771 F.2d at 404.

## II.

■ The extent of Davis's authority was the focus of the administrative hearing in this case, and of the Hearing Officer's recommendation to the Board. This consideration is also at the center of Color Art's defense in our Court to enforcement. The Hearing Officer held that "Davis possessed little power to independently institute meaningful changes in the terms or conditions of employment of employees." Case 14–RC–10412, Hearing Officer's Report and Recommendation 16 (March 9, 1989). Citing Davis's need to confer with his superiors, and the presence of written company policies, the Hearing Officer concluded that Davis's power over every important employment decision—hiring and firing, discipline, job assignments, and rewards—was too limited to ground a reasonable employee expectation of retaliation or reward based upon one's vote in the election. Color Art argues forcefully that this holding (and the findings beneath it) blink the reality of this workplace. In each of these decisional areas, the company urges, Davis enjoyed substantial authority. Since his men knew that authority, indeed felt it every day, and since they knew Davis's pro-union position, Color Art contends there is a good chance votes were influenced.

Though it is a close case, we are not convinced the Board erred in certifying the union in spite of supervisor Davis's conduct. The proper focus is, as Color Art urges, the realities of the workplace. By definition, every supervisor has a measure of control over employees' working conditions. Likewise, every front-line supervisor will himself be subject to some supervision. Our inquiry here, then, is how much authority, without meaningful review, did Davis possess (according to company policy) and wield (according to company practice). The Hearing Officer minimizes—perhaps too much—Davis's independent power. It is clear nonetheless that Davis was hemmed in by Color Art's policies and by

its practice of management consultation that permeates this record.

Consider, for example, supervisor Davis's role in hiring and firing. While only Color Art's President or Executive Vice President could hire or fire employees, both the operations manager and the first-level supervisor—especially the supervisor—played a critical role in recommending action. Ron Johnson, a temporary employee, was converted to permanent status only after a six-month trial period during which Terry Baum (the operations manager) and Davis conferred regularly about Johnson's progress. Only then did Baum recommend to his supervisors that Johnson be hired permanently. T. 462–80.

As the Hearing Officer noted, the record is clear that Davis could not fire someone on his own either. For instance, the recommendation of service manager Abernathy, a supervisor with parallel authority, to terminate an employee was modified by management to a 30–day suspension. Report and Recommendation 11. In the presence of many eligible voters during each of the union organizational meetings he attended, Davis gave contradictory assessments of his ability to fire someone. At one meeting he said he could not; at another meeting Davis said he could go to his boss and get it done. Report and Recommendation 5. Given supervisor Abernathy's experience, a better characterization would be that if termination were warranted, upper management would probably follow the supervisor's recommendation. To stress, as does Color Art, that the immediate supervisor's recommendation is crucial is, however, merely to note the obvious: first-level supervisors have the most contact with employees' performance. The involvement and ultimate decision by Davis's supervisors distinguishes this case from those advanced by the company in which there was no meaningful review of a supervisor's recommendations. *Cf. ITT Lighting Fixtures v. NLRB*, 712 F.2d 40, 44–45 (2d Cir.1983), *cert. denied*, 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 833 (1984).

Even though Davis might be bound regarding the ultimate employment decisions,

he might still hold and exercise sufficient authority over day-to-day aspects of the employees' work lives to affect their votes in the contested election. We disagree, however, with Color Art's characterizations of Davis's powers here. To be sure, Davis was responsible for making daily work assignments, scheduling vacations and overtime, and imposing minor discipline. He also participated in employee evaluations. But in each of those areas, as the Hearing Officer found, Davis's power was limited in important respects. Truck routes and co-worker assignments remained relatively stable. In fact, the decision to shift a particular driver into the important downtown route permanently, when the current driver signaled his intentions to retire soon, was made jointly by the operations manager and Davis. T. 576–78, 651–53.

There was a company vacation policy, both for extended time off and for single vacation days. Davis's decisions about the former were guided by seniority and workload; his decisions about the latter were guided by the company's needs and the policy's list of good reasons—such as a doctor's appointment—to be allowed a vacation day instead of a day without pay. At the margin, this is an aspect of Davis's power with the potential for abuse. He could possibly manipulate who received an okay for single vacation days based on union sympathies. There was testimony, however, that these days were routinely granted. T. 878. And even this part of Davis's authority was ultimately subject to review. The operations manager routinely monitored the employees' timesheets, kept by supervisors like Davis, where tardies, absences, overtime, and vacation days were recorded. T. 494. That that oversight was real is suggested by Baum's catching, and then discussing with Davis, a Monday-and-Friday pattern of absences by a certain employee. T. 490–91. But the record does not speak with one voice on this point. In one instance, the operations manager refused to overrule Davis's decision to cancel a previously granted vacation day because of furniture that needed delivering. T. 871, 875–76. Davis, then, had a measure of independent power with respect to single

vacation days. Given Color Art's policies, however, the mixed evidence of oversight detracts from, but is not fatal to, the Hearing Officer's conclusion here.

Davis's role with respect to discipline and employee evaluation was similarly significant but circumscribed by policy and review. Davis had the authority to issue written warnings or send a worker home for a violation of company policy. Davis rarely did either, however, without counseling with his boss. In the face of many instances of consultation prior to a warning, the record reveals only one time when on his own Davis sent an employee home. The operations manager's response is illustrative: Davis was told to document his version of events. He did so, and also asked another employee who witnessed the sending home to write down his memory of the event. This gathering of information—from the supervisor as well as a co-worker—sends a clear message that Color Art's supervision of its supervisors was not a rubber-stamp affair. T. 610–11, 925–26.

The yearly evaluation of employees was likewise initiated but not concluded by Davis and the other supervisors. Working within a detailed checklist provided by Color Art, Davis would suggest an evaluation for each employee he supervised. Baum and Davis would then confer about this recommendation. They would come to what Joe Steiner, Color Art's current President and former Executive Vice President, called a "collective recommendation." T. 150–52. During a later conference with the employee, either Baum or Davis, Compare T. 550–51 with T. 846–850, would walk the worker through the evaluation. Both supervisors often took part. The responsibility and the authority here were shared, and the possibility for abuse by Davis minimized. Since quarterly bonuses, if given at all, were based on these evaluations (and on subsequent recommendations by Davis coupled with review and comment from Baum), they too do not help Color Art's case. In sum, though substantial, Davis's power is subject to too many constraints to provide a fruitful way to reward or punish employees for their views on the union.

We come finally to the third relevant consideration: the employees' perceptions of Davis's power and of his tendency to use that power on them based upon their vote for or against the union. This is an important factor in our deliberations. The record here, however, is thin. In *Wright,* we dealt with a clearer case. We held that while relevant, employees' perceptions were not dispositive. *Wright,* 771 F.2d at 405–06. We came to that conclusion despite an unequivocal record that "the employees *knew* that the charge nurses (the overwhelming majority of whom supported the union) had immediate and virtually complete control over their working lives." *Id.* at 405 (emphasis supplied). No such certainty is revealed in this case.

Instead, we must seek the employees' perceptions in their interaction with supervisor Davis. The Board points to a conversation between an employee, James Crenshaw, and Davis in support of its contention that the employees perceived Davis as being unlikely to retaliate. Crenshaw told Davis he had made up his mind to vote against the union. Davis replied that Crenshaw should not spread his decision around because others might not like it. T. 776–77. If Davis was to be feared, the Board's argument runs, Crenshaw would never have revealed his anti-union sentiments to him. As counsel for Color Art pointed out at oral argument, there is one problem with this evidence: Crenshaw did not work for Davis. He was an installer. More telling are employee David Dalton's actions with respect to the list of Color Art's broken promises. Davis supervised Dalton every day. After a union meeting, Davis told Dalton it "could be" his "job" to compile that list. Dalton agreed. T. 951. It is unclear whether Dalton acted out of habit, fear, or sympathy with the union cause. Several days later Dalton told Davis he wasn't going to prepare any such list. Davis replied, "Oh, okay." T. 952–53. This episode indicates at least one employee's perception that Davis would not retaliate against anti-union actions. Further, we see nothing in Davis's admittedly extensive pro-union activities that contains the seeds of coercion. This consideration, then,

cuts in favor of the Board's ultimate conclusion that Davis's conduct did not taint this election.

### III.

█ Two other points raised by Color Art merit comment. The company charges the Hearing Officer with bias. It points to his supposedly overly restrictive evidentiary rulings, his repeated interruptions of the company's case, and his handling of Elmo Davis's absence from the hearing. In combination, Color Art contends these actions demonstrate an evaporating impartiality. It lost this admittedly close case, the company argues, because the Hearing Officer tilted against it at every turn and at the end. Mr. Davis's absence is important enough to be considered alone, and we do so below. We are unpersuaded, however, that the charge of bias has merit. The initial hearing in this case was, to be sure, less than harmonious. The Hearing Officer and Color Art's lawyer were often at odds. Disagreements between lawyers and judicial officials are, though regrettable, not uncommon. And this record reveals just that: regrettable disagreements, not bias. Without more—and our review of this record convinces us there is no more—we cannot conclude that the presumption of regularity attending this administrative proceeding has been overcome.

One of the most troubling aspects of this case is that though Elmo Davis is the root of the controversy, he never testified. Like Banquo's ghost, Davis hovers over the record, present but unheard. His testimony would likely have made clearer much that is murky. The Hearing Officer shared these sentiments. He repeatedly urged Color Art to call Davis. Color Art repeatedly refused. Its reasons were good: Davis was hostile to Color Art's attack on the election and friendly to the union's cause. After his sympathies were discovered, the company had reduced Davis's responsibilities. Though we have no record of it, counsel represents that Color Art offered to call Davis if the Hearing Officer would certify him as an adverse witness. The Hearing Officer supposedly refused,

**728**

again off the record. What the Hearing Officer repeatedly said on the record was this: he was considering drawing an adverse inference against Color Art if it did not call Davis. T. 61–62, 497–98. At one point, the Hearing Officer went even further: "I am going to draw an adverse inference if you do not call Mr. Davis." T. 520.

Color Art presses that the Hearing Officer was as good as his word. Since the company did not call Elmo Davis, the Hearing Officer must have inferred that Davis would have given evidence unfavorable to the company's position. The Board responds that there is no evidence that the Hearing Officer followed through on his remark. His Report and Recommendation, it notes, is based on his evaluation of the credited testimony in the record—not any inference about Color Art's refusal to call Davis. We reluctantly agree with the Board. This part of the case is also troubling because it is unnecessary. The Hearing Officer could have called Davis on his own. 29 C.F.R. § 102.66(a) (1988). Considering the parties' unwillingness, and Davis's central role in this controversy, he should have done so. See 29 C.F.R. § 102.64(a) (1988). To merit a new hearing, however, "bias and prejudice ... must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). Finding neither extrajudicial bias, nor mention in the Hearing Officer's opinion of such a questionable adverse inference, we cannot conclude there is error here.

\* · \* \* \* \* \*

This case is about Elmo Davis and his actions. We are left with this picture of him: a supervisor who actively campaigned for the union; a supervisor with an initial and important voice in many aspects of employees' work lives, but almost all of whose authority was ultimately limited by company policy and managerial oversight; and a supervisor who was probably per-

ceived by employees as unlikely to use his authority to reward or punish employees for their vote on the union. From the vantage of the record as a whole, we conclude that the Board's determination that there is no reasonable possibility that Davis's conduct impaired this election is supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The Board's order will be

Enforced.