**EVERGREEN HEALTHCARE, INC.,
d/b/a Willow Ridge Living Center,
Petitioner/Cross–Respondent,**

**v.**

**NATIONAL LABOR RELATIONS
BOARD, Respondent/Cross–
Petitioner.**

Nos. 95–6039, 95–6193.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 3, 1996.

Decided Jan. 17, 1997.

**869**

David W. Miller (argued and briefed), Todd M. Nierman, Baker & Daniels, Indianapolis, IN, for petitioner/cross–respondent.

Aileen A. Armstrong, Deputy Associate General Counsel, Charles P. Donnelly, Jr. (briefed), William M. Bernstein, Steven F. Rappaport (argued), N.L.R.B., Appellate Court Branch, Washington, DC, for respondent cross–petitioner.

Before: KENNEDY, JONES, and DAUGHTREY, Circuit Judges.

KENNEDY, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. JONES, J. (pp. 879–880), delivered a separate opinion concurring in part and dissenting in part.

KENNEDY, Circuit Judge.

Petitioner, Evergreen Healthcare, Inc., seeks review of a National Labor Relations Board supplemental decision and order finding Evergreen Healthcare committed unfair labor practices in violation of Sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (1). The National Labor Relations Board cross-petitions for enforcement of its order. For the reasons set forth below, we **GRANT** the petition for review and **DENY** the Board's cross-application for enforcement.

**I.**

Evergreen Healthcare, Inc. operates Willow Ridge Living Center, a long-term care nursing facility in Fort Wayne, Indiana. Willow Ridge employs a non-supervisory staff totaling fifty-five employees. The non-supervisory staff consists of nurse aides, dietary aides, housekeeping aides, and activity aides; the non-supervisory staff are supervised by seventeen licensed and/or registered nurses.[1]

In the Spring of 1990, Lois Dibble, a supervisor employed at Willow Ridge, contacted the President of District 1199 of the Indiana/Iowa Union of Hospital & Health Care Employees, SEIU, AFL–CIO ("Union") and commenced an organizational effort among Willow Ridge employees in support of Union 1199. Dibble met with Alice Bush, the President of the Union, in April, 1990 to discuss the structure of Willow Ridge and the process of unionizing. The same month, Dibble and Aaron Shultz, also a supervisor, met with Bush and discussed Willow Ridge employees' wages, benefits, and job security.

Shortly after these two meetings with Bush, Dibble and Shultz were terminated. Dibble was terminated on April 25, 1990; Shultz was discharged on May 31, 1990.[2] On June 11, 1990, the Union filed an unfair labor practice charge with the National Labor Relations Board charging that the discharges of Dibble and Shultz were unlawful.[3]

In early June, 1990, Bush assembled an organizing committee consisting of supervisory and non-supervisory employees to assist in the election of the Union by the forty-eight member bargaining unit. The supervisory members of the committee were Connie Ayres, Nancy Jehl, Brenda Hemrick, and Dawn Barton. Approximately seventeen non-supervisory employees were members of the committee. Each member of the committee was given a list of employees to whom

---

1. On August 29, 1990, the National Labor Relations Board held that the licensed and registered nurses were supervisors of the nurse aides under Section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11)(1973).

2. Although Shultz heard rumors of his discharge, he was not officially notified of his termination until June 5, 1990.

3. The charge was dismissed by the Board on January 24, 1991 because the Board concluded that Dibble and Shultz were supervisors and, therefore, not protected by the National Labor Relations Act.

they were to give information about the campaign.

Beginning in June, 1990, the Union held regular campaign meetings to garner support among the Willow Ridge employees; nine of the ten to eleven meetings were held at supervisors' homes. Eight of these meetings were held at the home of Shultz and Ayres despite Schultz's discharge in May, 1990. One meeting was held at Hemrick's home. During these organizational meetings, Bush instructed the committee on methods of getting employees interested in the Union 1199; she suggested the committee encourage employees to attend meetings, make telephone calls and visits to employees' homes, and engage in discussions during work breaks. These organizational meetings took place through election day on July 26, 1990.

Also in early June, 1990, the committee engaged in an effort to accumulate authorization cards for the Union. Several non-supervisory aides signed cards at the home of Ayres and Shultz while Ayres and Jehl were present. To garner authorization cards from employees who did not sign cards at Ayres' home, Shultz made housecalls to employees along with a Union official and other employees. Dibble, as well, made housecalls to aides. During one housecall to Nurse Aide Bertha Morgan by Dibble and Shultz, Morgan refused to sign an authorization card. Jehl telephoned Morgan asking "in a very rude voice ... are you going to sign that card or are you not." Morgan answered that she "did not know," to which Jehl responded, "[Jehl and other supervisors] [will] be over [your] house later on that evening." When Jehl and Hemrick arrived at Morgan's house that evening, Morgan signed the card. During this card "blitz," Ayres and Hemrick, in particular, were widely recognized by the employees as leading supporters of Union 1199.

On June 5, 1990, Bush, Shultz, Ayres, Hemrick, Jehl, Barton, and approximately twenty to twenty-five employees attended a meeting at Willow Ridge. At that meeting Hemrick announced to Willow Ridge Administrator Rick Oros that Union 1199 sought to be the collective bargaining agent for supervisory and non-supervisory staff at Willow Ridge.

From early June until the election, on July 26, 1990, the committee engaged in several other activities to garner support for the Union. For example, Bush furnished campaign buttons to Ayres, Jehl, Hemrick, and Barton to distribute to employees. Ayres, Jehl, Hemrick, and Barton wore their own campaign buttons to work on several occasions and Ayres distributed buttons to approximately seven non-supervisory employees. When Ayres offered buttons to employees, the employees understood that Ayres intended that they be worn. Nurse Aide Jacqueline Drake testified that she did not want to wear a campaign button but she accepted one to "get them off my back." Ayres handed a button to Nurse Aide Steve White and "told him to wear it and help boost the union." Jehl asked one nurse aide why she was not wearing a campaign button.

During the campaigning, several of the supervisors told non-supervisory staff that supporting the Union would result in various benefits to the nurse aides. For example, Ayres told employees that a vote for 1199 would result in "better wages, benefits, and more people to staff the facility," and "the way to get increased wages and improved benefits with more insurance benefits" was to vote for 1199. Ayres also announced that supporting 1199 "would [result in] better staffing" for employees. Supervisor Jehl told several employees that if they voted for the Union they would get better wages, better benefits, better working conditions and more staffing. Jehl solicited an authorization card from one non-supervisory employee while informing her that the Union could get the employees better wages and benefits.

Additionally, several supervisory nurses, including Ayres, Jehl, Hemrick, and Barton, distributed Union literature to non-supervisory employees at Willow Ridge. On one occasion, Ayres distributed literature to as many as twelve non-supervisory employees outside the entrance to the facility. While the literature was handed out, Union President Bush stood across the street and photographed the distribution. Ayres and Hem-

rick distributed literature on several other occasions inside Willow Ridge.

During the course of the campaign, the organizing committee sought the attendance of non-supervisory employees at campaign meetings. These meetings were attended by Ayres, Jehl, Dibble Shultz, Hemrick, and Barton. Hemrick, Ayres, and Jehl personally extended invitations to several nursing aides. On at least two occasions, members of the organizing committee offered nurse aides transportation to meetings if they wanted to attend. Approximately ten meetings were held prior to the election. The majority of these meetings were held at the home of Ayres and Shultz. During the meetings, Jehl and Ayres were particularly vocal in their support of Union 1199.

On the day of the election, the organizing committee made an effort to learn which employees had voted and how they voted. For instance, Jehl asked one dietary aide if he had voted yet. Similarly, Ayres asked a nurse aide if she had voted for the Union. When she asked, Ayres noted, "we [would] have a lot of benefits if [you] would vote for the union." The nurse aide, in response, testified that she "didn't want to get mixed up in [things] like this because the only reason I went along with them was they was my co-workers and I wanted to be able to work there." On election day, Jehl offered nurse aide Drake, also a Union supporter, transportation to work. Jehl had never made such an offer to Drake before.

On June 5, 1990, in the midst of the campaigning, the Union filed a petition with the National Labor Relations Board ("NLRB") seeking to represent supervisory and non-supervisory employees at Willow Ridge. Evergreen challenged the Union's inclusion of the nurse supervisors; accordingly, the Union amended its petition to omit the nurse supervisors. While the petition seeking to represent the non-supervisory employees was pending, the Union filed a petition seeking to represent the supervisory nurses.

On July 26, 1990, the NLRB conducted the election among the non-supervisory employees. The Union prevailed by a vote of thirty to fifteen. It was not until after the election that the NLRB Regional Director issued its decision finding that the Willow Ridge nurses were supervisors within the meaning of Section 2(11) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(11)(1973). The Board sustained the dismissal of the election petition on January 14, 1991.

Evergreen objected to the election but, on November 6, 1992, the NLRB Hearing Officer overruled the objections and recommended certification of the election. Central to the Hearing Officer's ruling was her conclusion that none of the supervisors made threats of reprisal or promises of benefits to coerce employees into supporting the Union. The Officer also concluded that the supervisory nurses were not "agents" of the Union; they, rather, had merely expressed their personal opinions regarding the Union.

The Board denied Evergreen's exceptions to the Hearing Officer's Report on February 17, 1994, because Evergreen failed to take action to prevent the supervisors from engaging in campaigning and was thereby estopped from complaining about the supervisors' conduct.

When Evergreen refused to bargain with the Union, the NLRB ruled, on June 15, 1994, that Evergreen's refusal was unlawful. On June 27, 1994, Evergreen filed a Petition for Review of the NLRB's decision with this Court. The NLRB petitioned to dismiss the petition pending before this Court in order that it could reconsider its decision. This Court granted the NLRB's motion on October 17, 1994.

On July 31, 1995, the NLRB issued a supplemental decision and order affirming the previous ruling that Evergreen's refusal to bargain was unlawful. However, in this decision, the NLRB relied on other reasoning than that set forth in its first opinion. In its supplemental decision, the Board held that the campaign conduct did not necessitate setting aside the election relying solely on the reasons given in the Hearing Officer's report which it had previously adopted.

Evergreen appeals from the supplemental decision of the Board. Because Evergreen does business within this judicial circuit, this Court has jurisdiction over the proceeding in

accordance with 29 U.S.C. § 160(e) and (f)(1973).

## II.

■ This Court upholds the Board's findings of fact if "they are supported by substantial evidence on the record viewed as a whole." *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir.1993); *see also* 29 U.S.C. § 160(e). Similarly, we review the Board's application of the law to the facts under a substantial evidence standard. 29 U.S.C. § 160(e); *Pentre Elec.* at 368 (citing *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986)). In determining whether substantial evidence supports the Board's findings, this Court must consider the record as whole, including evidence which is contrary to the Board's conclusions. *Id.*

■ The Board's conclusions of law, however, are reviewed by this Court *de novo.* See *Wilson v. NLRB*, 920 F.2d 1282, 1285 (6th Cir.1990), *cert. denied*, 505 U.S. 1218, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992). "If the Board errs in determining the proper legal standard, we may refuse enforcement on the grounds that the order has no 'reasonable basis in law.'" *Pentre Elec.* at 368 (quoting *Turnbull Cone Baking Co.* at 295).

## III.

### A.

■ In its objections to the certification of the election, Evergreen argued that the Union utilized supervisory nurses as agents in order to encourage bargaining unit employees to vote for the Union, and therefore, committed an unfair labor practice. The Hearing Officer overruled the objection on the ground that the supervisors' comments about the Union were merely expressions of personal opinion and, therefore, were not made at the direction of the Union. Specifically, the Hearing Officer held:

> The record falls short of establishing that any individual or group served as Petitioner's sole link with unit employees. Bush was on the scene and personally and ac-

tively directed the Union's election efforts, establishing that she was the sole spokesperson for the Union. There was no evidence that any of the nurses either formulated or expressed to the unit employees and [sic] campaign policy. Therefore no general agency status has been established as the objective indicates that the unit employees saw Bush, not the nurses, as having any authority in the Union. Despite the activities of the nurses and unit employees, which they engaged in with the full consent and knowledge of the Union, I do not find that the nurses nor any other member of the organizing committee acted as agents of the Union.

In its petition, Evergreen argues that substantial evidence does not support the Hearing Officer's conclusion that the supervisory nurses were not agents of the Union.

■ Union 1199 is responsible for the activities of nurses Lois Dibble, Aaron Shultz, Connie Ayres, Nancy Jehl, Brenda Hemrick, and Dawn Barton only if they were agents of the Union. "Generally, a union is not responsible for the acts of an employee, unless the employee is an agent of the union." *Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351, 355 (6th Cir.1983). An employee is considered an agent of the union if the union "'instigated, authorized, solicited, ratified, condoned or adopted' the employee's actions or statements." *Id.* (quoting *NLRB v. Miramar of California*, 601 F.2d 422, 425 (9th Cir.1979)). Alternatively, an employee will be considered an agent of the union if "the union has clothed the employee with apparent authority to act on behalf of the union." *Id.* Under the latter approach of apparent authority, the petitioner must demonstrate that the "union cloaked the employee with sufficient authority to create a perception among the rank-and-file that the employee acts on behalf of the union and that the union did not disavow or repudiate the employee's statements or actions." *Id.* (citations omitted).

■ The question of whether an employee is an agent is a question of fact; therefore, our review of this question is governed by the well-established rule that the Board's findings of fact are conclusive if supported by

substantial evidence. *See NLRB v. Pentre Elec., Inc.,* 998 F.2d 363, 368 (6th Cir.1993).

The Board, on several occasions, has held conduct such as in the case at hand insufficient to confer agency status on supervisors. An important consideration for the Board is whether the alleged agent is the sole link to the Union. For example, in *United Builders Supply Co., Inc.,* 287 NLRB 1364 (1988), the Board held that, although the purported agent was an active and vocal union supporter, engaged in the solicitation and collection of authorization cards on the union's behalf, and was asked by the union to set up and inform employees of union meetings, he was not an agent of the union because the union itself had a presence during the election campaign. *Id.* In reaching its conclusion, the Board noted that an employee's status as a leading union supporter alone is insufficient to establish an agency relationship. *Id.*

Similarly, in *S. Lichtenberg & Co., Inc.,* 296 NLRB No. 167, 1989 WL 224408 (1989), the Board adopted the Hearing Officer's conclusion that employee in-plant organizers were not agents of the union, despite the wide variety of activities they performed on behalf of the union, because employees were not left on their own to conduct the campaign; rather, union organizers participated in the campaign regularly. *Id.*

In view of these principles, substantial evidence supports the Board's conclusion that the supervisory nurses were not agents of Union 1199. As in *United Builders* and *Lichtenberg,* the nurse organizers were not the sole link to the Union. The Union, through Alice Bush, had a regular presence during the campaign. The record reveals that Bush accompanied supervisors when they solicited cards and when supervisory nurses visited employees' homes. Furthermore, Bush was in attendance at the organizational meetings. She was also present while literature was handed out. Thus, Bush was in attendance during many of the campaign activities. Because of Bush's regular presence during the campaign activities, substantial evidence supports the Board's conclusion that the nurses were not agents of the Union.

## B.

Even though members of the organizing committee were not agents of the Union, the election may still be invalidated if the pro-union statements and activities of the nurse supervisors impaired the non-supervisory employees' freedom of choice in the election so as to justify setting the election aside.

The participation of a supervisor in the campaign preceding a union election may undermine the employees' freedom of choice so much so that the election must be set aside. However, an election is not automatically invalidated when there has been pro-union activity by a supervisor. *See ITT Lighting Fixtures v. NLRB,* 658 F.2d 934, 936–37 (2d Cir.1981); *see also ITT Lighting Fixtures v. NLRB,* 712 F.2d 40 (2d Cir.1983) (enforcement denied after remand to NLRB). An election will be invalidated when the petitioner demonstrates that "the supervisor's conduct reasonably tended to have such a coercive effect on the employees that it was likely to impair their freedoms of choice in the election." *Id.* at 937; *see also NLRB v. Color Art, Inc.,* 932 F.2d 723, 724 (8th Cir.1991); *NLRB v. Cal–Western Transport,* 870 F.2d 1481, 1484 (9th Cir. 1989); *NLRB v. Island Film Processing Co., Inc.,* 784 F.2d 1446, 1451 (9th Cir.1986). The party challenging the election need not introduce proof of actual coercion. *Island Film Processing* at 1451; *ITT Lighting Fixtures* at 937.

To determine whether a supervisor's conduct reasonably tended to have such a coercive effect on the employees that it was likely to impair their freedoms of choice in the election, the Board and the circuit courts have considered the following two factors: (1) the degree of supervisory authority possessed by those who engaged in the pro-union activity; and (2) the extent, nature, and openness of the pro-union activity. *ITT Lighting Fixtures* at 937.

Regarding the first factor, the Board, in its August 29, 1990 decision and order, found that the licensed and registered nurses were supervisors within the meaning of the National Labor Relations Act, 29 U.S.C.

§ 152(11), because the nurses: (1) possessed the authority to issue verbal discipline and to effectively recommend more severe discipline which affects the employment tenure of aides; (2) enforced the employer's personnel policies; (3) recommended the reward of employees through their role in the evaluation process; (4) authorized overtime; and (5) assigned and monitored the daily work of the aides. The Board concluded that if the nurses were not found to be supervisory, the aides would be unsupervised seventy-five percent of the time.

The Hearing Officer noted the Regional Director's findings in her report; however, the Officer failed to consider the extent of the nurses' supervisory power when determining whether their conduct warranted invalidation of the election. In the Hearing Officer's view, the supervisory powers of the nurses was not a significant factor in the analysis because: (1) the nurses' status as supervisory was undecided during the campaigning; (2) Evergreen treated the nurses as unit employees by allowing them to campaign; and (3) the employees did not believe the nurses were supervisors because they campaigned side-by-side.

■ None of these reasons, however, render the supervisory status of the nurses inconsequential. First, whether or not the legal question of the supervisory status of the nurses had actually been decided by the Regional Director at the time of the campaigning is virtually irrelevant to whether the nurses actually possessed such authority and were viewed by the aides as supervisors. All of the facts upon which the Regional Director relied in arriving at his conclusion that they were supervisors, such as the nurses' authority to issue verbal discipline, their authority to approve overtime, and their monitoring of the daily work of the aides, were obvious to the aides at Willow Ridge during the time of the campaign. The Regional Director's decision merely confirmed the legal status upon those facts.

■ Second, while Evergreen did allow the nurses to campaign, it had little choice but to do so. Had Evergreen prohibited the nurses' pro-union activity and had the Board concluded that the nurses did not have su-

pervisory status under section 2(11) of the National Labor Relations Act, Evergreen would have engaged in an unfair labor practice. See 29 U.S.C. §§ 157, 158 (1973). Indeed, the Board's withdrawal of its earlier opinion appears to have been in recognition of this fact.

■ Similarly, the fact that the nurses campaigned side-by-side with the aides is again a function of the fact that Evergreen faced little choice but to allow such campaigning. Whether the non-supervisory employees believed the nurses were their supervisors would not realistically be determined by the fact that they were campaigning together; they were campaigning together because the supervisory nurses had sought their own union representation. Contrary to the Hearing Officer's conclusion, we find that the fact that they were campaigning together, while the supervisory nurses had their own request for union representation, suggests that the aides would have perceived the nurses as having greater authority over them when their request to form a union was granted. We, thus, conclude that the Hearing Officer erred in failing to adequately consider the degree of supervisory power possessed by the nurses who engaged in the pro-union campaigning.

■ Before addressing the second factor, we must determine whether the conduct of Dibble and Shultz, the two discharged nurses, should be considered in our analysis of the extent and openness of the supervisors' pro-union conduct. The Fourth and Seventh Circuits have addressed the issue of whether the pro-union activity of a discharged supervisor should be considered in determining whether the election should be set aside. In *NLRB v. Howard Johnson Motor Lodge*, 705 F.2d 932 (7th Cir.1983), a supervisor, who engaged in coercive pro-union activities, was dismissed by the employer before the election. *Id.* at 935. After her dismissal, the supervisor told several employees that " 'she was going to get her job back with full back pay.' " *Id.* The Seventh Circuit held that, in light of this statement, the supervisor's conduct should be considered in determining whether the employees' free choice had likely

been impaired because "employees could have reasonably believed that they would be subject to [the] supervisor['s] displeasure if the Union failed to win the election." *Id.*

In contrast, in *NLRB v. Hydrotherm*, 824 F.2d 332 (4th Cir.1987), the Fourth Circuit would not consider a discharged supervisor's pro-union activity even though an unfair labor practice charge on behalf of the supervisor was pending prior to the election.[4] *Id.* at 335. In the Fourth Circuit's view, to determine "the likelihood of coercion where the employer has discharged a pro-union supervisor, the Board must consider whether the employees had a reasonable expectation of his reinstatement." *Id.* Applying this principle, the court disregarded the supervisor's activities because the court found that the company "presented no evidence ... to demonstrate that its employees knew of the pending unfair labor practice charge or had any expectation that [the supervisor] would be reinstated." *Id.*

The Hearing Officer in the case at hand concluded that the conduct of Dibble and Shultz should not be considered because, although the Union filed an unfair labor practice charge on behalf of Dibble and Shultz, "the record discloses that the Employer, bearing the burden of proof, presented no evidence indicating any of the unit employees knew of the pending charge or expected Dibble and/or Shultz to be reinstated."

Evergreen, in support of its argument to include Dibble and Shultz state:

> In a small bargaining unit (only 48 employees) it is *reasonable to infer* the charge was common knowledge, as Dibble and Shultz were active in the campaign and attended numerous 1199 meetings after the charge was filed and prior to the election. The possibility Dibble and Shultz might return to their supervisory positions was potentially coercive to employees.

Appellant's Brief at 25–6 n. 11 (emphasis added) (citations omitted). The record is silent of any direct evidence demonstrating that non-supervisory employees were aware of the pending charge or that Dibble and/or Shultz made any comments to employees re-

garding their charge and the possibility that they might return to Willow Ridge. Nevertheless, we agree with Petitioner that, under the specific facts of this case, it is reasonable to infer that the employees were aware of the pending charge and that the employees could believe that Dibble and Shultz might return to work.

The record reveals that, after Shultz's termination on May 31, 1990, a meeting was held at his house at which approximately forty employees attended and during which authorization cards were distributed. This meeting lasted over an entire weekend and totaled four days. Shultz also, following his termination, visited approximately four to six aides at their homes to ask them to sign union authorization cards. All four to six aides signed authorization cards. Subsequent meetings were also held at Shultz's home. In total, Shultz attended eight to ten meetings after his termination, the majority of which were held at his home.

Similarly, subsequent to her termination, Lois Dibble attended every meeting that Shultz attended. She also accompanied Shultz in visiting aides at their homes to sign authorization cards. Under these circumstances, we find that Dibble and Shultz's conduct should be taken into consideration. Not only was the bargaining unit small, but also there was no explanation for Shultz and Dibble's pervasive presence at campaign activities and continued efforts on behalf of the union except that they expected to return to work.

 The degree of supervisory authority possessed by the nurses here is significant and the Hearing Officer's reasons for rejecting the likelihood of the supervisors' conduct as reasonably tending to have a coercive effect on the employees are unwarranted. We turn then to the second factor, the extent, nature and openness of the pro-union activity of the supervisors.

It is patently clear that supervisors Ayres, Jehl, Hemrick, Dibble, Shultz, and Barton campaigned actively on behalf of the Union. They wore union buttons to work, attended union meetings, handed out union buttons,

---

**4.** The bargaining unit in *Hydrotherm* consisted of at least 115 members.

distributed authorization cards, and spoke about the Union at union meetings. The Hearing Officer specifically concluded that: (1) nurses Barton, Hemrick, Ayres, and Jehl signed authorization cards; (2) nurse Hemrick picked up a signed authorization card from an aide; (3) nurse Ayres distributed authorization cards; and (4) Jehl picked up an authorization card from an aide.

Moreover, there is additional evidence of conduct which might have reasonably tended to coerce the aides into failing to exercise their freedom of choice. For example, nurses exerted pressure on aides to sign authorization cards. During one call at the home of Nurse Aide Bertha Morgan by Dibble and Shultz, Morgan refused to sign an authorization card. Jehl telephoned Morgan asking "in a very rude voice ... are you going to sign that card or are you not." Morgan answered that she "did not know," to which Jehl responded, "[Jehl and other supervisors] would be over [your] house later on that evening." When Jehl and Hemrick arrived at Morgan's house that evening, Morgan signed the card.

In addition, the display of campaign buttons was frequently a topic of discussion between supervisors and aides. Nurse Aide Jacqueline Drake testified that she did not want to wear a campaign button but she accepted one to "get them off my back." Ayres handed a button to Nurse Aide Steve White and "told him to wear it and help boost the union." Jehl asked one nurse aide why she was not wearing a campaign button.

The pressure continued to the day of the election. On election day, Ayres asked a nurse aide if she had voted for the Union. When Ayres asked, she said, "we [would] have a lot of benefits if I would vote for the union." The nurse aide, in response, testified that she "didn't want to get mixed up in [things] like this because the only reason I went along with them was they was my co-workers and I wanted to be able to work there." This conduct of the supervisors is equal to or greater than that of the supervisors in *NLRB v. Island Film Processing Co.*,

784 F.2d 1446 (9th Cir.1986), and *Delchamps, Inc.*, 210 NLRB 179 (1974). Taking into consideration all of the evidence presented to the Board, we hold that the Board's conclusion that the campaign activities of the supervisory nurses would not reasonably have tended to have such a coercive effect on the employees that it was likely to impair their freedoms of choice in the election is not supported by the evidence.

We find additional support for our decision in cases decided by several other circuits. The United States Court of Appeals for the Fourth Circuit in *NLRB v. River Walk Manor Inc.*, No. 86–3887, 1987 WL 38910 (4th Cir. Oct. 26, 1987)(unpublished disposition)[5], discussed by both parties in their briefs, found that conduct similar but less severe than that in the case at hand warranted invalidation of a union election. In *River Walk Manor*, four supervisory nurses and twenty other employees of River Walk Manor, a nursing home, attended a meeting with a union seeking to represent the nursing home employees. Two of the supervisory nurses, Kiser and Purnell, encouraged the employees to organize an effort to support the union. *Id.* at * 1. The same two supervisors attended another meeting with union officials during which authorization cards were distributed and support for the union was again expressed. At River Walk Manor, supervisor Kiser voiced her support directly to the employees she supervised and solicited union authorization cards from five employees. When one employee expressed the desire to speak with her husband before signing an authorization card, Kiser told her that the card could fall into the wrong hands if she took it home and that the next day would be too late to sign the card. *Id.*

Following the filing of the election petition, the supervisors continued to attend union meetings and urged employees to "stick together and vote yes for the union, because we will get better wages, better job security, and better benefits." *Id.* at * 2. After the NLRB ruled that the four nurses were supervisors and excluded them from voting in

---

**5.** We are mindful that *River Walk Manor* is an unpublished opinion. However, in this case, we depart from our usual practice of relying solely on published opinions in light of the parties' extensive reliance on *River Walk Manor*.

the election, the nurses curtailed much of their union activity, but when Kiser was asked whether her opinions had changed about the union, she replied they had not and she was overheard making several pro-union statements to employees. *Id.* On election day, the union won by a vote of fifty-three to thirty. *Id.*

The Fourth Circuit, in denying enforcement of the election, held that "it is clear from the evidence that supervisory charge nurses were active in promoting the union, and that certain of these nurses, particularly Kiser, focused her pro-union activities upon those whom she supervised. This is [a] threat to an open and free election ..." *Id.* at * 3. In so holding, the court noted that a switch of only eleven votes would have altered the election results. *Id.* at * 4.

In the instant case, not only did the supervisory nurses engage in more pervasive and potentially coercive conduct than that in *River Walk,* but also a change of only eight votes would have turned the election. In addition, unlike in *River Walk,* more than one supervisor engaged in significant pro-union conduct up until the day of the election. Nurses Shultz, Dibble, Ayres, Jehl, Hemrick, and Barton engaged in the conduct deemed improper largely by only one nurse in *River Walk.*

The Hearing Officer principally relied on *Wright Memorial Hosp. v. NLRB,* 771 F.2d 400 (8th Cir.1985), in concluding that the supervisory nurses' conduct did not warrant setting aside the election. Contrary to the Hearing Officer's report, we find *Wright Memorial* supports the conclusion that the nurses' conduct at Willow Ridge reasonably tended to have such a coercive effect on the employees that it was likely to impair their freedoms of choice in the election.

In *Wright Memorial,* twelve to thirteen of fifteen hospital charge nurses signed authorization cards and wore union buttons in support of the union. Three of the charge nurses were active in the campaign beyond wearing of buttons and signing of authorization cards; their conduct included expressing support for the union and articulating the benefits the union might provide. *Id.* at 404–05. However, none of the nurses distributed cards or buttons accompanied with pressure or persuasion and none of the nurse required the employees to sign authorization cards or return the cards to them. In addition, none of the three played leadership roles in the election campaign. *Id.* at 405. Moreover, at the organizational meetings, the three nurses only responded to employee inquires. The Eighth Circuit concluded that, although "the evidence could support a finding that the supervisors' actions interfered with the employees' free choice to such an extent that the supervisors' actions materially affected the results of the election," the Board could reasonably infer from the facts that the employees' freedom of choice could not have reasonably been impaired. *Id.* at 406.

Significantly, unlike in *Wright Memorial,* the supervisory nurses at Willow Ridge did more than merely respond to employee inquiries at organizational meetings and it is undisputed that they asked employees to sign authorization cards and to wear pro-union buttons under significant pressure by the supervisory nurses. We cannot help but conclude that such conduct would chill persons they supervised from expressing opposition to the union in the workplace.

The final factors often deemed significant by other circuits in determining whether pro-union conduct of supervisors invalidates an election are the size of the bargaining unit and the ratio of pro-union supervisors to employees. *See, e.g, Island Film Processing* at 1453 (five supervisors expressed support to twenty-six employees; five votes would have turned the results in the election). We are dealing with a small bargaining unit in the case at hand. The bargaining unit consists of only forty-eight employees. Nurses Jehl, Ayres, Hemrick, and Barton each supervised four or five employees and among them a total of seventeen employees. The Union won the election by a vote of thirty to fifteen. Thus, if only eight of those seventeen employees had changed their votes, the Union would have lost the election.

An election will be invalidated if the petitioner demonstrates that "the supervisor's conduct *reasonably tended* to have such a

coercive effect on the employees that it was likely to impair their freedoms of choice in the election." *ITT Lighting Fixtures v. NLRB,* 658 F.2d 934, 936–37 (2d Cir.1981) (emphasis added); *see also NLRB v. Cal-Western Transport,* 870 F.2d 1481, 1484 (9th Cir.1989); *NLRB v. Island Film Processing Co., Inc.,* 784 F.2d 1446, 1451 (9th Cir.1986); *NLRB v. Color Art, Inc.,* 932 F.2d 723, 724 (8th Cir.1991). The party challenging the election need not introduce proof of actual coercion. *Island Film Processing* at 1451; *ITT Lighting Fixtures* at 937. Based on a consideration of the factors enumerated in cases such as *ITT Lighting Fixtures* and *Island Film Processing,* there was insubstantial evidence for the Hearing Officer to conclude that the supervisors' pro-union activities would not have reasonably tended to have such a coercive effect on the employees that it was likely to impair their freedoms of choice in the election.

The Hearing Officer likely arrived at the conclusion she did because of her improper focus on actual coercion. The Hearing Officer worded the test as follows: whether the nurses' pro-union conduct "could coerce unit employees into supporting the union out of fear of future retaliation or hope of future rewards." Elsewhere, the Officer commented that "given the circumstances of this case, the decision issuing after the election indicating the nurses are supervisory and the campaigns of the Union and the Employer, it is improbable that absent any actual threats or promises by the nurses the unit employees could reasonably have been concerned about avoiding retaliation by or receiving rewards from the nurses." At the conclusion of her opinion, the Officer concluded that "the pro-union conduct of Ayres, Jehl, Hemrick and Barton could not reasonably have coerced the unit employees into supporting the union either in fear of retaliation or in hopes of reward."

The manner in which the Hearing Officer applied the test focused at times on whether the activities of the supervisors "could coerce" the non-supervisory staff but, at other times, on whether actual threats or promises were employed by nurse supervisors. The proper test to be applied is whether the

activities "reasonably tended to have such a coercive effect on the employees that it was likely to impair their freedoms of choice in the election." Thus, the Hearing Officer appears to have erroneously leaned toward requiring proof of actual coercion. "If the Board errs in determining the proper legal standard, we may refuse enforcement on the grounds that the order has no 'reasonable basis in law.'" *Pentre Elec.* at 368 (quoting *Turnbull Cone Baking Co.* at 295). Because the Hearing Officer did not apply the facts in this case to the proper test as articulated in *ITT Lighting Fixtures,* for example, enforcement of the election would be improper. It is for this reason, as well, that enforcement of the election is denied.

### IV.

For the foregoing reasons, we **DISMISS** the Board's cross-petition for enforcement and **DENY** enforcement.

NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.

I concur with the result in this case. I write separately because I disagree with the outcome the majority reaches regarding Nurses Dibble and Shultz. While this issue is not dispositive, I believe the issue is important enough to warrant a separate writing.

The majority finds that the conduct of Dibble and Shultz, two discharged nurses, should be considered in the analysis "of the extent and openness of the supervisors' pro-union conduct." *Maj. Op.* at 875. In *NLRB v. Hydrotherm, Inc.,* 824 F.2d 332 (4th Cir. 1987), the Fourth Circuit held that where a supervisor is discharged, "the Board must consider whether the employees had a **reasonable expectation** of his reinstatement." *Id.* at 335 (emphasis added) (citation omitted). The supervisor in that case had a pending unfair labor practice charge, but the company failed to present evidence that any of the employees knew of that charge or had any expectation to think the supervisor would be reinstated. *Id.; see also NLRB v. Howard Johnson Motor Lodge,* 705 F.2d 932, 935 (7th Cir.1983) (holding that where direct evidence was presented that supervisor told employees she would get her job back, em-

ployees had reasonable expectation that she would be reinstated).

In this case, the employees did not have reason to believe that Dibble and Shultz would be reinstated. The majority opinion states that "[t]he record is silent of **any** direct evidence demonstrating that non-supervisory employees were aware of the pending charge or that Dibble and/or Shultz made any comments to employees regarding their charge and the possibility that they might return to Willow Ridge." *Maj. Op.* at 876 (emphasis added). Nevertheless, the opinion holds that "it is reasonable to **infer** that the employees were aware of the pending charge and that the employees **could believe** that Dibble and Shultz **might return** to work." *Id.* (emphasis added). I believe this standard is extremely broad and haphazardly extends the "reasonable belief" standard enunciated by the Fourth and Seventh Circuits.

The opinion points out that Dibble and Shultz held several pro-union meetings, yet the company failed to produce the statement of a single employee that demonstrates Dibble or Shultz indicated that they would return to work. The majority opinion points to significant statements the employees made regarding other supervisors. *Maj. Op.* at 876–877. Therefore, it seems that if the employees thought Shultz or Dibble was going to return to work, the company could have obtained a statement by an employee indicating as much. The evidence before this court does not indicate that the employees "reasonably believed" that Dibble and Shultz would be reinstated. Consequently, their conduct should not have been considered in the majority's analysis.

The supervisors who remained employed, however, campaigned actively for the union. Therefore, I agree with the outcome reached by the majority.